# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-KA-01702-SCT

**STANLEY GILMORE a/k/a STANLEY TREMAINE
GILMORE a/k/a "MONEY"**

***v.***

**STATE OF MISSISSIPPI**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/14/2011 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | CLAIBORNE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | FRANK G. VOLLOR |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | ALEXANDER C. MARTIN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 06/27/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., CHANDLER AND KING, JJ.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.    Stanley Gilmore was convicted of aggravated assault and possession of a weapon by a convicted felon on September 7, 2011, in the Circuit Court of Copiah County. Gilmore stipulated that he previously had been convicted of two separate felonies and that he had shot Delwin Smith four times in self-defense. Gilmore appealed his conviction, raising numerous errors. We reverse and remand for a new trial on both counts, because Gilmore was prejudiced by the introduction of inadmissible evidence of a prior conviction.

## FACTS

¶2. In March of 2011, Delwin Smith and Ronnie Thompson worked together as promoters for a rap concert in Port Gibson, Mississippi, and agreed to split the proceeds from the concert evenly. During the concert, Stanley Gilmore (also known as "Money") told Thompson that he saw Smith's brother pocketing ticket money from one of the doors. That night, Smith and Thompson had a dispute regarding the amount of money they had split. On March 28, 2011, Smith went to Thompson's house to discuss the matter. Smith and Thompson spoke outside the house at first. At some point, Gilmore came outside, Thompson went back inside, and Smith was shot four times and severely wounded.

¶3. Smith testified that he was not angry when he arrived at Thompson's house and only wanted to resolve the disagreement. He claimed that, after an initial friendly greeting, Gilmore began to "cop an attitude" and "wanted to get violent." When Smith began to back away, Gilmore pulled a gun out of the waist of his pants and shot Smith below the heart as Smith turned to leave. Smith fell to the ground, and Gilmore shot him two more times in his arm and in the hip. Smith said "Money, man, you ain't got to shoot me." Gilmore then shot him a fourth time in his side before fleeing. Thompson came outside, helped Smith off the ground and into a truck, and took him to the hospital. Although Smith was hit with only four bullets, he said he heard five shots and one of them missed, but not the first one. Smith maintained he did not take a gun to the house, made no threats toward Gilmore, and did not struggle with Gilmore over a gun.

¶4. Thompson testified that Smith was upset because, after the concert, Thompson told Smith he was not going to work with him anymore. When Smith came to the house, he was

2

angry and said he was tired of hearing people "talking in the street" about his brother stealing money. He asked to talk to Gilmore, who came outside and told Smith what he had seen during the concert. Smith then threatened Gilmore, saying "I got wolves, I got killers, I got guns," which Thompson understood to mean he had people who "would do something to people for him." Thompson went inside to get another person named "Cool," because he didn't know what was "getting ready to go off." At that point, Thompson heard a couple of gunshots, looked out the front-door peep hole, and saw Smith on the ground. Thompson called 911 and took Smith to the hospital.

¶5.     Gilmore testified that he was upstairs talking to a family member over Facebook when Thompson called him downstairs. He claimed he was not carrying a gun, and that Smith was in a rage when he went outside. After Thompson went back in the house, Gilmore testified that Smith ran toward him with a gun. Gilmore then grabbed Smith's hand, and a shot went off, hitting a blue and red Crown Victoria in the driveway. A tussle ensued, in which Smith and Gilmore wound up on the ground, and the gun fired several times as Gilmore wrestled to get the gun. Gilmore explained that he "grabbed [the gun] at an angle down pulling it towards out of [Smith's] hand" and Smith fell on top of him. Gilmore got control of the gun, got up off the ground, saw Smith get up, and then "squeeze[d] the gun, but I can't say I hit him." Gilmore dropped the gun, ran down the street and called a friend who took him to Vicksburg. He fled instead of going the police"because I was scared of what he was going to do to me," and because Smith told him "that his people work on the force" in Port Gibson and "that he's paid those." He believed Smith would somehow be able to use his influence to hurt him.

3

¶6. Freddie Yarbrough, a Clairborne County sheriff's deputy, testified that he investigated the scene the day of the shooting, and that he found no gun and saw no bullet holes in the Crown Victoria. Elbert Hyder, called by the State during rebuttal, testified that he drove up to the house during the incident and witnessed Gilmore holding a gun and backing away from the house, while Smith came around the back of the house with blood running down his back. Hyder did not hear any gunshots, and after pulling into the driveway to see if Gilmore was going to shoot Smith, he backed up and drove away, because he had children in the car with him.

¶7. Gilmore was convicted on both counts, and the trial court denied his motions for directed verdict and a new trial. Gilmore now raises the following errors: (1) that the verdict was against the overwhelming weight of the evidence, (2) that the trial judge erred in rejecting his requested lesser-included-offense instruction, (3) that the trial judge inadequately instructed the jury that the State had the burden of proving beyond a reasonable doubt that he did not act in self-defense, (4) that the trial judge erred in admitting evidence of a prior conviction of simple battery, and (5) that the State improperly presented evidence in its rebuttal case that it was required to present during its case-in-chief. Moreover, he argues that, cumulatively, these errors merit reversal, even if none merits reversal standing alone.

> **1. Whether the verdict was against the overwhelming weight of the evidence such that the trial court abused its discretion by denying Gilmore's motion for a new trial.**

¶8. Smith argues the trial court should have granted his motion for a new trial, and that to uphold the verdicts would sanction an unconscionable injustice. Specifically, he claims

4

the overwhelming weight of the evidence proved that Smith was the aggressor who threatened Gilmore with the gun, and that Gilmore acted in self-defense.

¶9.    We review the denial of a motion for a new trial for abuse of discretion. *Sheffield v. State*, 749 So. 2d 123, 127 (Miss. 1999). We must view the evidence in the light most favorable to the verdict, and a new trial will be granted only in those "exceptional cases in which the evidence preponderates heavily against the verdict" and is "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005) (quoting *Amiker v. Drugs for Less, Inc.*, 796 So. 2d 942, 847 (Miss. 2000)). The evidence supporting the verdict must be extremely weak, tenuous, or doubtful for us to award a new trial. *Dilworth v. State*, 909 So. 2d 731, 737 (Miss. 2005). The "jury is the sole judge of the weight of the evidence and the credibility of the witnesses," and it may choose to believe one witness over another. *Ewing v. State*, 45 So. 3d 652, 655 (Miss. 2010) (quoting *Mohr v. State*, 584 So. 2d 426, 431 (Miss. 1991)).

¶10.    A person who "attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm" is guilty of aggravated assault. Miss. Code Ann. § 97-3-7(2)(a)(ii) (Rev. 2006). Because Gilmore stipulated that he had caused bodily injury to Smith by shooting him four times, the State had to prove only that Gilmore "purposely or knowingly" shot Smith, and not in self-defense. The State provided ample evidence, primarily Smith's detailed account, for a reasonable jury to believe that Gilmore purposely and knowingly shot Smith, that Gilmore was the aggressor, and that he did not act in self-defense. The jury, being the sole judge of

5

witness credibility, was entitled to believe Smith's story over Gilmore's and Thompson's stories. Further, certain facts in Gilmore's testimony were contradicted by both Officer Yarbrough and Elbert Hyder, such as that the first shot hit a parked car in the driveway, that Gilmore dropped the gun at the scene, and the description of the clothes Gilmore was wearing. Just because the jury chose to believe Smith over Gilmore does not mean the verdict was based on extremely weak or tenuous evidence, and Gilmore's evidence did not preponderate heavily against the verdict. Gilmore is not entitled to a new trial on aggravated assault.

¶11.    Under our felony possession statute, a convicted felon is prohibited from possessing "any firearm." Miss. Code Ann. § 97-37-5 (Rev. 2006). Because Gilmore stipulated that he was a convicted felon who was not able to possess a firearm lawfully, the State needed only to prove that Gilmore had "willfully possessed a firearm." *Jones v. State*, 920 So. 2d 465, 473 (Miss. 2006). Again, this was a fact question that the jury was entitled to decide in favor of the State. Smith testified that Gilmore had a gun on his person when he came outside, and that Gilmore had produced the gun and shot him. Even though Gilmore testified that he wrestled the gun away from Smith only in self-defense, the jury heard enough evidence that it reasonably could find that Smith's story was true. In addition to Smith's testimony, Hyder testified that he saw Gilmore holding the gun. The jury's finding that Gilmore willfully possessed the firearm with which he shot Smith was not based on extremely weak or tenuous evidence, and we will not disturb that finding now. Gilmore's claim in this issue is without merit.

6

## 2. Whether the trial court erred in refusing to instruct the jury on simple assault.

¶12. The trial court rejected Gilmore's requested jury instruction on the lesser-included offense of simple assault. Gilmore argues that there was a sufficient evidentiary basis for a conviction of that lesser offense, and that the trial court was required to grant his request. Specifically, Gilmore points to his testimony that he did not know why Smith was angry, that he did not have a gun when he came down the stairs, that Smith first possessed the gun, and that Gilmore wrestled the gun away from Smith such that Smith was accidently shot several times. Gilmore also testified that, after he wrestled the gun away from Smith, he squeezed the trigger once – but could not say whether he hit Smith – before dropping the gun and running away. The State argues there was no evidentiary basis for a jury to find that Gilmore acted negligently, and that a negligence theory is inconsistent with Gilmore's self-defense theory. In other words, Gilmore could not have negligently shot Smith in self-defense.

¶13. We review a trial judge's denial of a lesser-included-offense jury instruction de novo. *Downs v. State*, 962 So. 2d 1255, 1258 (Miss. 2007). While "[a] defendant is entitled to have jury instructions given which present his theory of the case," we have held that "the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Newell v. State*, 49 So. 3d 66, 74 (Miss. 2010) (quoting *Hearn v. State*, 3 So. 3d 722, 738 (Miss. 2008)). To be entitled to a lesser-included-offense instruction, "a defendant must point to some evidence in the record from which a jury reasonably could find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense." *Goodnite v. State*,

799 So. 2d 64, 69 (Miss. 2001). We must view the evidence in the light most favorable to the defendant, draw all reasonable inferences in his favor, and take into account "that the jury may not be required to believe any evidence offered by the State." *Fairchild v. State*, 459 So. 2d 793, 801 (Miss. 1984). But if no reasonable jury could have found the defendant guilty of the lesser-included offense, we will uphold the denial of the proposed instruction. *Id.*

¶14.    Even viewing this evidence in a light most favorable to Gilmore, Gilmore has not presented sufficient evidence of negligence. A person is guilty of simple assault if he "negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm." Miss. Code Ann. 97-3-7 (Rev. 2006). "Once a deadly weapon is introduced, the distinction between simple and aggravated assault . . . hinges upon whether the injuries were inflicted negligently or intentionally." *Jackson v. State*, 684 So. 2d 1213, 1230 (Miss. 1996). We have stated that "[t]he recklessness or negligence contemplated by the statute is in the act itself" and "does not refer to the subjective intent of the defendant." *Nobles v. State*, 464 So. 2d 1151, 1154 (Miss. 1985). "Moreover, when serious or substantial bodily harm has resulted, we have been inclined to hold that the case is definitely one of aggravated assault." *Jackson*, 684 So. 2d at 1230 (citing *Hutchinson v. State*, 594 So. 2d 17, 20 (Miss. 1992); *Harbin v. State*, 478 So. 2d 796, 800 (Miss. 1985); *Colburn v. State*, 431 So. 2d 1111, 1114 (Miss. 1983)).

¶15.    If all of the shots that hit Smith were fired as a result of the struggle, then Gilmore acted in self-defense, not out of negligence. In *Nobles*, we stated that a theory of self-defense is incompatible with a theory of negligence, in that "[t]he reckless or negligent *belief* that [the

8

defendant] was acting in self defense is contra to the foundation of that defense, i.e., the reasonable belief of imminent bodily harm." *Nobles*, 464 So. 2d at 1154 (emphasis in original). If we assume Gilmore's account that Smith attacked him is credible, then Gilmore's self-defense struggle could not have been negligent, as he would have had a reasonable belief of imminent bodily harm.

¶16. It is possible, however, that, after the period of time in which Gilmore reasonably acted in self-defense (that is, after wrestling the gun away from Smith), Gilmore could have negligently (rather than intentionally) fired one more shot and hit Smith one more time, giving rise to a simple assault. Yet, Gilmore's testimony that he squeezed the trigger once but did not know if he shot Smith is the only possible evidence of negligence and is too tenuous for a reasonable juror to have found that Gilmore acted out of negligence. We have stated that "a lesser-included offense instruction should never be granted on the basis of pure speculation." *Fairchild*, 459 So. 2d 793, 801 (Miss. 1984). Again, we look to the act itself to determine negligence, and not to Gilmore's subjective intent. Squeezing the trigger and hitting Smith caused serious bodily harm, and as such, we are "inclined to hold that the case is definitely one of aggravated assault." *Jackson*, 684 So. 2d at 1230. We affirm the trial court on this issue.

3. **Whether the trial court adequately instructed the jury that the State had the burden of proving beyond a reasonable doubt that Gilmore did not act in self-defense.**

¶17. Gilmore further argues that the requested simple-assault instruction, Instruction D-1, was the only instruction that adequately explained to the jury that the State had the burden to prove beyond a reasonable doubt that Gilmore did not shoot Smith in self-defense.

9

Because D-1 was rejected, he argues the instructions were defective in explaining his theory of self-defense to the jury and that he is entitled to a new trial. However, Gilmore does not claim that the admitted instructions did not adequately explain his theory of self-defense or were otherwise defective in stating the law, except that he argues they did not clearly state which party had the burden of proof regarding self-defense. While noting in its brief that this issue "caused us some concern," the State argues that, taken together as a whole, the instructions adequately instructed the jury and that Gilmore was not denied a viable defense.

¶18.    Jury Instruction 2 read:

> The Court instructs the Jury that the law presumes every person charged with the commission of a crime to be innocent. ***This presumption places upon the State the burden of proving the defendant guilty of every material element of the crime with which he is charged***. Before you can return a verdict of guilty, the State must prove to your satisfaction beyond a reasonable doubt that the defendant is guilty. The presumption of innocence attends the defendant throughout the trial and prevails at its close unless overcome by evidence which satisifies the jury of the defendant's guilt beyond a reasonable doubt. ***The defendant is not required to prove his innocence***.

(Emphasis added.) The trial court gave several additional instructions, namely Instructions 4, 5, 6 ,7, and 9, which explained the law on self-defense. Further, the jury was instructed in Jury Instruction Number 11 that "a reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of evidence, or the insufficiency of the evidence; but however it arises, if it arises, it is your sworn duty to find the Defendant 'Not Guilty.'"

¶19.    We review the denial or acceptance of a proposed jury instruction for abuse of discretion. ***Maye v. State***, 49 So. 3d 1124, 1129 (Miss. 2010). Again, "[a] defendant is entitled to have jury instructions given which present his theory of the case," but "the court

10

may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Newell* 49 So. 3d at 74. Jury instructions must be considered together, and if, when read as a whole, the instructions "fairly announce the law of the case and create no injustice, no reversible error will be found," even if they do not perfectly describe the law. *Maye*, 49 So. 3d at 1129 (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (Miss. 2006)).

¶20.    In *Pierce v. State*, we granted a new trial where the defendant's requested instruction, which explained that the State had the burden of proving the defendant did not act in self-defense, was denied. *Pierce*, 289 So. 2d 901, 902 (Miss. 1974). We did so because "[t]here was no other instruction, either for the State or for the defendant, setting out or dealing with the rule about which appellant desired that the jury be informed" and because the "omission was not cured by a reading of all of the instructions together." *Id.* However, we previously have approved the precise language of Jury Instruction 2 and held it sufficient to instruct the jury that the State has the burden of proving that the defendant did not act in self-defense. In *Maye v. State*, the jury was not specifically instructed that the State bore the burden of proof on self-defense. *Maye*, 49 So. 3d 1124, 1130 n.1 (Miss. 2010). However, just as in this case, Instruction Number 2 in that case stated that, "'the State [has] the burden of proving the defendant guilty of every material element of the crime . . .' and that '[t]he defendant is not required to prove his innocence.'" *Id.* We held that "[t]his instruction survives the *Pierce* rule, since it informed the jury that it should not look to Maye to prove self-defense, but to the State to prove the lack thereof." *Id.*

11

¶21. Gilmore contends that Jury Instruction 2, when read together with Jury Instruction 3, is misleading, because Instruction 2 instructs that the State must prove "every material element of the crime with which he is charged." Because Instruction 3 provides a list of elements for the State to prove that does not include "and not in self-defense" or words to that effect, Gilmore argues the implication of the instructions, when read together, is that the State had to prove only the elements listed in Instruction 3 beyond a reasonable doubt. However, as was the case in *Maye*, any ambiguity here was resolved by the instruction that Gilmore was "not required to prove his own innocence." Further, Instruction Number 11 made clear that, however a reasonable doubt arose, the jury was sworn to find Gilmore not guilty. We find that the jury was sufficiently instructed that the State bore the burden of proving beyond a reasonable doubt that Gilmore did not act in self-defense.

4. **Whether the trial judge erred by allowing the State to question Gilmore about his prior assault conviction in Louisiana.**

¶22. During the State's cross-examination of Gilmore, the State asked Gilmore whether he was a violent person and then asked him about his conviction for battery against a former girlfriend in Louisiana. Gilmore's counsel objected to both questions, arguing that Gilmore had not placed his character at issue prior to this point, and that he already had stipulated that he was a convicted felon. The State specifically argued to the trial court that it was using the conviction to impeach Gilmore's statement that he was not a violent person, but also argued that "[t]hese are assault convictions which is violent. We're trying crimes of violence which he says he's not a violent person."

¶23. The specific exchange between the State and Gilmore was as follows:

12

Q. Who is – I may be pronouncing this wrong, but do you know a Carnise Sanders?

A. Yes, that's one of my kids' mother's [sic].

Q. You've never –

A. Actually I have two kids by her.

Q. And you're not a violent person?

[Gilmore's counsel immediately requested a conference with the judge. His objection was overruled]

Q. You were saying you had two children by her?

A. Yes.

Q. Have you ever admitted to battery on her?

A. We have had our disagreements.

Q. Well, you were not convicted in a court in Louisiana on simple battery on her?

A. It was a charge that I probably pleaded to get out of jail on it, yes, sir.

¶24. Gilmore argues this evidence was inadmissible character evidence under Rule 404(b), and that its admission prejudiced him such that he is entitled to a new trial. *See* Miss. R. Evid. 404(b). The State argues that this questioning was proper impeachment by a prior conviction under Rule 609(b), and that, in any event, the introduction of this evidence was harmless error because the jury already had been informed that Gilmore was a convicted felon. *See* Miss. R. Evid. 609(b).

¶25. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the

Court will not reverse this ruling." ***Welde v. State***, 3 So. 3d 113, 116-17 (Miss. 2009) (quoting ***Fisher v. State***, 690 So. 2d 268, 274 (Miss. 1996)). "Reversal is proper only where such discretion has been abused and a substantial right of a party has been affected." ***Johnson v. State***, 666 So. 2d 499, 503 (Miss. 1995). Absent an exception, "[g]enerally, evidence of any crime other than the one for which the defendant is being tried is not admissible." ***Welde***, 3 So. 3d at 117.

A.     *Was this evidence admissible under Rule 404(B)?*

¶26.     Mississippi Rule of Evidence 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith," but may "be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Miss. R. Evid. 404. We employ a two-part test for determining when evidence of other crimes is admissible under Rule 404. ***Welde***, 3 So. 3d at 117. First, "the evidence offered must . . . be relevant to prove a material issue other than the defendant's character," and second, "the probative value of the evidence must outweigh the prejudicial effect." ***Id.*** (quoting ***Crawford v. State***, 754 So. 2d 1211, 1220 (Miss. 2000)).

¶27.     No connection exists between the five-year-old Louisiana conviction for simple battery against Gilmore's girlfriend and the current aggravated-assault charge. The State does not argue that the conviction was introduced to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The trial transcript indicates the State sought to admit the evidence at least in part as character evidence – that is, in order to suggest that Gilmore acted in conformity with the prior conviction –  when it

14

argued to the trial judge: "We're trying crimes of violence which he says he's not a violent person." This was clearly impermissible.

¶28. Although the State also sought to impeach Gilmore about whether or not he was a violent person, Gilmore's credibility in regard to that answer would not be a material issue in the case. Moreover, to impeach Gilmore, the State, not Gilmore, first sought to put Gilmore's character at issue, a tactic which we have long held to be impermissible. ***Johnson***, 666 So. 2d at 503; ***Tobias v. State***, 472 So. 2d 398, 400 (Miss. 1985). While the State does not argue that it was seeking to prove an element of felony possession of a firearm, it bears noting that this element was established by Gilmore's stipulation. Thus the prejudicial effect of this testimony would have far outweighed its probative value. This evidence was not admissible under Rule 404.

        *B.     Was this evidence admissible under Rule 609(1)(B)?*

¶29. Mississippi Rule of Evidence 609 governs impeachment of a defendant with a prior conviction, and "restricts the use of convictions to those for which the penalty is death or imprisonment for one year or more or those involving 'dishonesty or false statement.'" ***Blackman v. State***, 659 So. 2d 583, 585 (Miss. 1995) (quoting Miss. R. Evid. 609). In this case, Gilmore was convicted of simple battery in Louisiana, a crime which carries a maximum potential punishment of being "imprisoned for not more than six months." La. Rev. Stat. Ann. § 14:35.

¶30. The State relies generally on the abuse-of-discretion standard of review and asserts that it "think[s] this conviction via guilty plea was admissible by virtue of" Rule 609(1)(B). The State cites no law supporting this assertion. Neither does it argue that simple battery is

15

a crime involving dishonesty or a false statement, nor address how Gilmore's conviction of a crime carrying a maximum penalty of six months was admissible to impeach Gilmore's credibility under Rule 609. This State's argument that this evidence was admissible under Rule 609 is completely without merit.

  C.  *Was admission of this evidence harmless error?*

¶31. The State falls back on the claim that, even if this evidence was inadmissible, its admission did not prejudice Gilmore and amounted to harmless error. Specifically, because Gilmore stipulated to the jury that he was a convicted felon, then testimony regarding his conviction for simple assault would have come as no prejudicial surprise to the jury.

¶32. "Where an error is deemed harmless, reversal is not warranted." ***Williams v. State***, 991 So. 2d 593, 606 (Miss. 2008). However, this Court has narrowly defined harmless error, stating that "[a]n error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty." ***Forrest v. State***, 335 So. 2d 900, 903 (Miss. 1976). Relevant factors in determining whether error was harmless or prejudicial include "whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." ***Ross v. State***, 954 So. 2d 968, 1018 (Miss. 2007).

¶33. In ***Forrest v. State***, where "the evidence was fairly evenly divided on the issue of defendant's guilt," improper questioning and improper arguments by the State were found to be individually harmless, but, cumulatively, they required reversal of the defendant's burglary conviction. ***Forrest***, 335 So. 2d at 903. The improper questioning in ***Forrest*** involved insinuations that the defendant had committed similar acts before (but not that he

16

had been convicted of them), and attempts to discredit the defendant's witnesses as being paid for their testimony. *Id.* at 901. The evidence of Gilmore's prior conviction in this case, which involved a battery against Gilmore's girlfriend, was much more prejudicial than that in *Forrest*. Moreover, each time the State in *Forrest* asked an improper question, the judge instructed the jury to disregard the statement. *Id.* That was not done by the trial judge in this case.

¶34. The State cites *DeHenre v. State*, in which a daughter's out-of-court statement to a 911 dispatcher that "my father has shot my mother" was admitted as an excited utterance, even though the daughter did not witness the actual shooting. *DeHenre v. State*, 43 So. 3d 407, 418-19 (Miss. 2010). We held this was harmless error, because the dispatcher was able to testify that she asked the daughter whether she had seen the shooting, and the daughter said she did not. *Id.* at 419. There, any prejudice was offset by clarifying testimony that the daughter did not actually witness the crime. There is no similar offsetting testimony here.

¶35. In *Williams v. State*, a case involving felony possession of a weapon, we found the trial court's denial of the defendant's offer to stipulate to his prior felony conviction to be harmless error, due to overwhelming evidence supporting the verdict, "including the victim's photo line-up identification, the victim's testimony, as well as corroborating gas station surveillance videotape, and 911 audiotape." *Williams*, 991 So. 2d 593, 606 (Miss. 2008). Here, however, the evidence was fairly even on both sides, with two eyewitnesses testifying to completely contrary events for each side, and no corroborating surveillance tape to contradict Gilmore's story.

¶36. In a Court of Appeals case also titled *Williams v. State*, the defendant was charged with aggravated assault for stabbing the victim with a pocket knife and with felony possession of a deadly weapon. *Willams*, 37 So. 3d 717, 719 (Miss. Ct. App. 2010). At trial, the State introduced the defendant's stipulation that he was a convicted felon to prove the felony possession count. *Id.* at 723. On appeal, the State conceded that a pocket knife did not constitute a deadly weapon under the statute. *Id.* at 719-20. Upon reversing the felony possession conviction, the Court of Appeals held that the introduction of the defendant's prior conviction, which would have been inadmissible except for the felony possession charge, was clearly prejudicial. *Id.* at 721-22. The Court of Appeals emphasized that the defendant's case hinged on his own testimony that he had stabbed the victim in self-defense, and that his credibility was a key factor in the outcome of what was a "close case." *Id.* at 722-24.

¶37. Because of the close "he said, she said" nature of the evidence in this case, we cannot say that "a fair minded jury could have arrived at no verdict other than that of guilty." Instead, the issue of innocence or guilt is close, and the quantity and character of the evidence favors neither Gilmore nor the State substantially. Moreover, the aggravated-assault charge is a grave offense for which Gilmore was sentenced to twenty years' imprisonment. The State acknowledges that it, not Gilmore, first sought to put Gilmore's character at issue by asking whether he was a violent person in order to impeach him with his prior conviction. As the State candidly points out in its brief, we have held previously that such "impeachment is impermissible and grounds for reversal and remand." *Johnson*, 666 So. 2d at 503. The

18

introduction of Gilmore's prior battery conviction was not harmless error, and Gilmore is entitled to a new trial on both the aggravated-assault and felony-possession charges.

> **5.** **Whether the trial court erred when it allowed the State to call Elbert Hyder during rebuttal.**

¶38. Gilmore further complains that, during rebuttal, the State was allowed to call Elbert Hyder, who testified that he had witnessed part of the incident, including Gilmore carrying a gun. Gilmore contends the State purposely withheld Hyder's testimony until after its case-in-chief and argues that the State was obligated to present all relevant evidence bearing on Gilmore's guilt during its case-in-chief. The State contends Hyder's testimony – that he saw Gilmore backing away while holding the gun and that Gilmore was wearing a "black dickey suit" – was offered to rebut Gilmore's testimony that he was wearing pajamas and a "wife-beater" t-shirt and that he did not illegally possess the gun. Gilmore extensively cross-examined Hyder, and it is apparent from his counsel's objection in the record that Gilmore was not surprised by the content of Hyder's prospective testimony. After the State rested its rebuttal case, the judge asked Gilmore's counsel "Anything else, counsel?" to which Gilmore's counsel responded "No, your honor."

¶39. A trial court's decision to allow substantive evidence in rebuttal is reviewed for abuse of discretion. *Mills v. State*, 813 So. 2d 688, 691 (Miss. 2002); *Roney v. State*, 167 Miss. 827, 150 So. 774, 775 (1933). The general rule in Mississippi is that "the party who has the burden of proof, and the duty to open the case, must in his opening, and before he rests in his proof, introduce all the substantive evidence upon which he relies to establish his demand, and the extent of that demand." *Roney v. State*, 167 Miss. 827, 150 So. 774, 775 (1933). In

19

*Myers v. State*, we stated that admission of substantive evidence during rebuttal "does not constitute reversible error, unless it is shown that no opportunity is afforded the defendant to reply by surrebuttal testimony." *Myers*, 353 So. 2d 1364, 1369 (Miss. 1978).

¶40.    "Whether the testimony evidence is properly offered during the case-in-chief or as rebuttal evidence is not always clear," and when it is unclear, "the trial judge must be given due discretion, especially when the defendant is permitted surrebuttal." *McGaughy v. State*, 742 So. 2d 1091, 1094 (Miss. 1999). When some doubt exists about whether the evidence offered should have been presented during the State's case-in-chief,

> the court should resolve the doubt in favor of the reception in rebuttal where (1) its reception will not consume so much additional time as to give an undue weight in practical probative force to the evidence so received in rebuttal, and (2) the opposite party would be substantially as well prepared to meet it by surrebuttal as if the testimony had been offered in chief, and (3) the opposite party upon request therefor is given the opportunity to reply by surrebuttal.

*Roney*, 150 So. at 775-76. However, "[i]t is only in such doubtful cases that [reception of substantive evidence in rebuttal] should be permitted," and "no party should be permitted as a deliberate trial tactic to decide in advance of trial to withhold a part of his case in chief . . . and then offer the evidence in rebuttal." *Hosford v. State*, 525 So. 2d 789, 791 (Miss. 1988).

¶41.    This situation falls into the "doubtful case" category, in which this Court should resolve the doubt in favor of admitting the State's testimony. The State clearly had a rebuttal purpose in calling Hyder, primarily using his testimony to impeach Gilmore's testimony regarding what he was wearing as well as his description of the shooting. While Hyder's testimony was also substantive evidence that Gilmore possessed the gun, it was not solely

20

offered as substantive proof that Gilmore possessed the gun. All of the ***Roney*** factors were met here. Hyder's testimony did not "consume so much additional time as to give an undue weight" to his testimony, as his direct testimony consisted of two pages in the trial transcript. Gilmore's counsel was not surprised by Hyder's testimony, and Gilmore just as easily could have answered it by surrebuttal as he could have during his case-in-chief.

¶42.    Gilmore was given the opportunity for surrebuttal, and he chose not to present any. We treat "rebuttal testimony that is unchallenged with no surrebuttal testimony by the opposite party as somewhat similar to a motion to reopen a case." ***Smith v. State***, 646 So. 2d 538, 543 (Miss. 1994). Generally, a party should liberally be allowed to reopen a case to show facts that are vital to the issues "and a failure to do so may be considered an abuse of judicial discretion." ***Reagan Equip. Co. v. Vaughn Gin Co.***, 425 So. 2d 1045, 1047-48 (Miss. 1983) (quoting ***Wells-Lamont Corp. v. Watkins***, 247 Miss. 379, 387, 151 So. 2d 600, 604 (1963)). Under our liberal standard, the judge properly allowed the State to call Hyder during rebuttal.

**6.        Whether cumulative errors merit reversal.**

¶43.    Because the erroneous admission of Gilmore's prior battery conviction, standing alone, entitles Gilmore to a new trial, there is no need to address this issue.

### CONCLUSION

¶44.    The introduction of inadmissible evidence of Gilmore's previous battery conviction was improper impeachment. This error was unduly prejudicial and affected a substantial right. We reverse the judgments of conviction of the Circuit Court of Clairborne County and remand for a new trial on both counts.

¶45.    **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, PIERCE, KING AND COLEMAN, JJ., CONCUR.**