# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00896-COA

**RECARDO FRAZIER A/K/A RECARDO RANDELL FRAZIER A/K/A RICARDO FRAZIER**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

DATE OF JUDGMENT:          08/12/2022
TRIAL JUDGE:               HON. CHARLES E. WEBSTER
COURT FROM WHICH APPEALED: COAHOMA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:    ROBERT SNEED LAHER
ATTORNEYS FOR APPELLEE:    OFFICE OF THE ATTORNEY GENERAL
                           BY: ASHLEY LAUREN SULSER
                               LAUREN GABRIELLE CANTRELL
DISTRICT ATTORNEY:         BRENDA FAY MITCHELL
NATURE OF THE CASE:        CRIMINAL - FELONY
DISPOSITION:               AFFIRMED - 03/26/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     After a second jury trial, Ricardo Frazier was convicted of first-degree murder with a firearm enhancement. The trial court sentenced him to life imprisonment in the custody of the Mississippi Department of Corrections. On appeal, Frazier argues that the trial judge erred in refusing to give a heat-of-passion manslaughter instruction. Further, Frazier argues that the court erred in refusing to allow him to read certain proffered testimony from the first trial, which ended after the first jury could not reach a verdict. We find no error and affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2. Frazier owned and operated a construction company. Sometime between 2012 and 2014, Ellis Pittman hired Frazier to complete construction projects at his home and law office. At some point during the construction work on Pittman's home, Pittman "failed to pay [Frazier] for the work that had been done[,]" which resulted in Frazier placing a lien on Pittman's property.

¶3. On August 1, 2014, Pittman sued Frazier for compensatory and punitive damages and threatened to sue him in federal court under the Fair Debt Collection Practices Act. On August 28, 2014, Frazier responded to the complaint and asserted a counterclaim for punitive damages due to Pittman's "bad faith." On June 26, 2015, Frazier attended a deposition related to the litigation. The deposition took place at Pittman and Associates PLLC ("Pittman's law office") located in Clarksdale, Mississippi. Dr. Kushna Damallie, who had previously hired Frazier for a construction project on his home was the individual being deposed. The accounts of all witnesses present indicated that the deposition was a "routine" and "normal" deposition. There were no raised voices, no arguments, and no heated discussions. When the deposition ended and as the people present were collecting their documents, Frazier pulled out a .45-caliber pistol and shot Pittman numerous times. Pittman died from those gunshot wounds.

¶4. On December 9, 2015, a Coahoma County grand jury indicted Frazier for first-degree

murder[1] with a firearm enhancement[2] (Count I); possession of firearm by a felon[3] (Count II); possession of stolen firearm[4] (Count III), and carrying a concealed weapon[5] (Count IV). The first trial occurred February 25-26, 2020. During the trial, the court granted Frazier's motion for a directed verdict on the possession-of-a-stolen firearm charge (Count III), and that count was dismissed. After hearing from all the witnesses and considering all the evidence, the jury convicted Frazier of only two of the three submitted counts: possession of a firearm by a felon (Count II) and carrying a concealed weapon (Count IV). The jury was unable to reach a verdict as to Frazier's first-degree murder charge (Count I), and the court therefore ordered a mistrial as to that charge. On February 28, 2020, Frazier was sentenced to serve a term of ten years in the custody of the Mississippi Department of Corrections for possession of a firearm by a felon (Count II) and to serve a concurrent term of five years in custody for carrying a concealed weapon (Count IV). These convictions and sentences were not appealed.

¶5.     After the mistrial, a second trial occurred on August 8-10, 2022, on the first-degree murder charge (Count I). At trial, the State called Marquell Jenkins, who testified that she worked as a receptionist at Pittman's law office. Jenkins testified that on June 26, 2015, Frazier, Pittman, Frazier's attorney William Luckett, Pittman's attorney Melvin Miller, Dr.

---

[1] Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014).

[2] Miss. Code Ann. § 97-37-37(2) (Rev. 2014).

[3] Miss. Code Ann. § 97-37-5 (Rev. 2014).

[4] Miss. Code Ann. § 97-37-35(1) (Rev. 2014).

[5] Miss. Code Ann. § 97-37-1 (Rev. 2014).

Damallie, and a court reporter Joyce Redmond, came to the office for a deposition. Jenkins testified that the deposition "was held in the conference room on the bottom floor." Jenkins recalled that at approximately 4:30 p.m. she "heard a gunshot" followed by "several more gunshots." She called the police. This call to the police was played to the jury and entered into evidence. On cross-examination, Jenkins admitted that she did not physically see Frazier shoot Pittman.

¶6. The State called Mark Haynes. Haynes testified that he was a Clarksdale police officer who responded to a "[a] person being shot" at Pittman's law office. He arrived at the scene in "less than two minutes" and entered the building with Investigator Brad Hillhouse and another officer. Haynes testified that he saw Pittman "in the conference room on the floor." Haynes stated Miller and Redmond were also in the room. Haynes testified that there was "paper strewn around" the room and that Miller was on the ground "working on [Pittman] or comforting him." Pittman was lying "down beside the table on the left side of the room." Haynes testified he saw "shell casings" and a gun on the floor.[6] Haynes testified he later learned that Frazier had "run out the back door."

¶7. Milton Williams was also called to testify. Williams was a Clarksdale police officer who responded to the scene of the crime. When Williams arrived at Pittman's law office, he searched the scene and discovered a .45-caliber gun in a dumpster located in the back parking

---

[6] This gun was Pittman's .380-caliber pistol. The uncontradicted testimony indicated this gun was never fired.

4

lot.[7] Williams showed the gun to Investigator Hillhouse, who collected it into evidence.

¶8.     The State called Brad Hillhouse. Hillhouse was an investigator for the Clarksdale Police Department and the first officer to arrive on the scene. Hillhouse testified that he saw and spoke to Pittman, who "advised [him] that [Frazier] ran out the back door." Hillhouse recalled that Pittman "was [lying] [on] the floor to the left of the conference table." Hillhouse also testified that Pittman had a ".380 caliber" gun in his hand, and Hillhouse "told [Pittman] to drop the gun." Hillhouse testified that he did not see any other weapons in the conference room at that time.

¶9.     Hillhouse explained that he checked the back of the building and then "proceeded down the alley . . . because [he] had information that [Frazier's] vehicle was parked at [Luckett's] law office."[8] He testified that he returned to the scene because Williams informed him he had found a Springfield Armory .45-caliber pistol "inside the garbage can outside [Pittman's] law office." Hillhouse retrieved the weapon and "placed it inside of [an] evidence bag[.]" Hillhouse testified that he ultimately located Frazier's vehicle in the parking lot of Luckett's office but did not find Fraizer. On cross-examination, Hillhouse testified that when he retrieved the .45-caliber gun, he observed that the gun was empty, and there were no remaining bullets in the gun.

¶10.    The State next called Charles Sledge, who was an investigator for the Clarksdale

---

[7]  The uncontradicted testimony indicated the .45-caliber gun was the gun Frazier fired at Pittman.

[8]  Luckett's law office was located at 143 Yazoo Avenue in Clarksdale. Pittman's law office was located at 123 Sharkey Street in Clarksdale. Luckett testified Pittman's law office was located "about two blocks" away from Luckett's law office.

5

Police Department. Sledge responded to the shooting at Pittman's law office at "4:36, 4:37." Sledge entered the building and saw Pittman lying on the floor "in the conference room" with a .380-caliber pistol "beside him" and "shell casings laying on the floor." Sledge testified that he "started taking photos, collecting evidence." The .380-caliber pistol was entered into evidence. Sledge testified he collected five shell casings, and they were all for a .45-caliber pistol. There were "[n]o casing[s]" that were for a .380-caliber pistol. On cross-examination, Sledge admitted that the .380-caliber pistol was loaded. A bullet from the pistol was entered into evidence.[9]

¶11. Dr. Damallie was called to testify. Dr. Damallie was the individual being deposed on the day of the shooting. He testified the deposition lasted approximately one hour. He confirmed there were no harsh tones, arguments, or raised voices during the deposition. He explained that after the deposition, Luckett and Frazier were leaving the room when he heard a shot and saw Pittman fall to the ground. Frazier left the room immediately after the shot. Dr. Damallie admitted he left the conference room and went into an office until the police arrived. On cross-examination, he admitted he did not see Frazier with a gun.

¶12. Luckett's testimony from the previous trial was read into evidence.[10] On June 26,

_____

[9] This bullet was a live round (meaning never fired) taken from the barrel of the .380-caliber gun for purposes of the investigation.

[10] As previously stated, the first trial occurred on February 25-26, 2020, and a mistrial was declared for the first-degree murder charge when the jury failed to reach a verdict. Luckett passed away before the second trial, so his prior testimony was admissible under Mississippi Rule of Evidence 804(b)(1). The transcript indicated that the judge and the attorneys read their respective parts, and Beverly Harris read Luckett's part.

2015, Luckett and Frazier traveled together[11] to Pittman's law office to attend the deposition of Dr. Damallie. Luckett testified that Pittman deposed Dr. Damallie, and Luckett had the opportunity to cross-examine Dr. Damallie. The deposition lasted "about 30, 40 minutes long[.]" Luckett testified there was "no tension" and "no emotion displayed," and the deposition "proceeded as usual." Luckett stated the deposition "never evinced any kind of emotion or tension," and there was "nothing extraordinary about it." Luckett "didn't detect any ill will" and described the events as "just a routine kind of deposition in a civil case." Luckett testified he had "been in a lot of depositions in 42 years . . . and [he had] seen a lot of emotions come forth during testimony, and this one just didn't have any of that in [his] view."

¶13. Once the deposition was over, Luckett indicated to Redmond that he "didn't have any further questions[.]" Luckett testified he looked at Frazier and "g[a]ve him a nod like, [']let's go['']." Luckett thought Frazier was "following [him] out" when he walked out of the conference room's "double doors" toward a second door that led to the outside parking lot. Luckett testified that "just as [he] was about to open that door . . . [he] heard what sounded like a gunshot." Luckett heard "one shot" and then heard a "quick succession of more shots." The "next thing [he] knew, [he] was upstairs in that building." Luckett testified he "didn't know what was going on or who was doing what."

¶14. Luckett testified he "looked out of a back window" and saw Frazier "walking hurriedly" in a "westerly direction" toward Luckett's office. The police arrived shortly

_____

[11] Luckett testified that Frazier left his vehicle near Luckett's office, and Luckett drove himself and Frazier to the deposition.

7

thereafter. Luckett went downstairs and went into the conference room and observed that "Miller was down tending to [Pittman]." Miller and Pittman were on the "left side of the conference table, sort of where they had been seated before, but [Pittman] was down on the floor." Redmond was also in the room. Luckett observed that the room was in "disarray" and saw a "pistol on the floor."[12] Luckett recalled Pittman was conscious and "somewhat" speaking. Luckett testified he "did not" see a gun on Pittman's person and "did not" see Pittman make any motions toward a pistol. Luckett testified he "did not" see a weapon on Frazier that day. On cross-examination, Luckett testified that he felt the "deposition was really more favorable to [Frazier] than it was to [Pittman]." Luckett further testified the shooting was a "complete surprise" to him. After Luckett's testimony from the first trial was read to the jury, Frazier proffered a portion of Luckett's testimony and exhibits pertaining to the civil litigation between Frazier and Pittman. The court allowed the testimony to be proffered but did not allow it to be presented to the jury as the court found it was "irrelevant."

¶15. The State then called Joyce Redmond. Redmond was the court reporter present during Dr. Damallie's deposition. Redmond testified that after the deposition, Luckett and Frazier "left the room" while she, Pittman, and Miller "were sorting through the exhibits[.]"[13] All three individuals were standing, with Pittman to the right of Redmond and Miller to the right

_____

[12] This gun was not the one Frazier fired during the subject incident.

[13] There is some dispute in the testimony as to whether Frazier actually ever left the room. It is clear from the testimony that he began to get up and follow Luckett out of the conference room but at some point returned to the conference table and started shooting.

8

of Pittman. Redmond testified Frazier then "came in" and "slid[ ] over the table," and she saw him "shooting his gun" at Pittman. Redmond recalled she heard "two or three" gunshots. Redmond testified she "hit the floor" and "crawled over against some windows" to "get out of the way." Redmond testified Pittman "went down." Eventually, Frazier left the room, and Redmond "start[ed] hollering for help."

¶16. On cross-examination, Redmond indicated she did not notice any odd behavior by Frazier when he first came to the deposition. When asked if she anticipated any heated arguments or discussions, Redmond responded, "[N]ot at all." She further indicated that "in 40 years of being a court reporter, [she had] seen what a contentious deposition look[ed] like," and "[t]his was not one of those depositions[.]"

¶17. Melvin Miller, the attorney who worked with Pittman at the time of the shooting, was called to testify. Miller described the "tone" of the deposition as "normal." He explained there was no arguing during the deposition. Miller testified that at no point were any questions ever asked of Frazier. Miller testified he was seated next to Pittman during the deposition, and Luckett was seated next to him while Frazier was across the table. They were all close to each other, and he insisted he would have heard if Pittman had ever made a statement to Frazier. At the end of the deposition, Luckett "got his papers together and left[.]" Pittman and the court reporter were "getting documents together" and then heard a loud noise. Pittman dove under the conference table. Miller testified that he saw Frazier "holding a gun" and shoot under the table. Miller told Frazier, "[P]lease don't kill anybody." Miller testified he saw Frazier shoot some more "rounds" and then Frazier ran out of the

9

room. After Frazier left, Pittman asked Miller to "pray" for him and call his wife.

¶18. The State called Dr. Mark LeVaughn, a physician who "specializ[ed] in forensic pathology employed by the medical examiner's office." In 2015, Dr. LeVaughn was the chief medical examiner for the State. Dr. LeVaughn was tendered and accepted as an expert specializing in the field of forensic pathology. He testified that his office performed the autopsy on Pittman. Dr. LeVaughn testified he did not actually perform the autopsy, but he conducted his own independent examination or determinations with regard to the manner and cause of death. Dr. LeVaughn testified that Pittman had "two entry gunshot wounds that were identified." He testified that "there was an entry wound to the lower lateral, or outside, of the left side of the back. And then there was another entry wound on the left buttock." Dr. LeVaughn testified that "[i]n [his] opinion, the cause of death of . . . Pittman [was] multiple gunshot wounds." He further opined that the manner of Pittman's death was homicide.

¶19. The State called Byron McIntire, who was employed by the Mississippi Forensic Laboratory as a "firearms and tool mark examiner." McIntire was accepted as an expert in the field of firearm and tool mark examination. McIntire testified he examined "striations and marks" to determine if certain shell casings or projectiles were shot from a particular weapon. McIntire testified he received and tested five .45-caliber shell casings collected from the crime scene. The .45-caliber pistol recovered from the dumpster was entered into evidence. The .380-caliber pistol from Pittman was also entered into evidence. McIntire opined that after the testing, he determined to a "reasonable degree of scientific certainty"

10

the shell cases from the crime scene and projectile were fired by the .45-caliber pistol that had been collected from the dumpster.[14]

¶20.    During a jury instructions selection hearing, Frazier proposed several manslaughter instructions.  The court refused all the proposed manslaughter instructions due to a lack of sudden provocation as required under Mississippi Code Annotated section 97-3-35 (Rev. 2014).  The jury convicted Frazier of first-degree murder.  Frazier was sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections.  On August 12, 2022, Frazier filed a motion for judgment notwithstanding the verdict or, alternatively,  a new trial.  In that motion, Frazier argued the "[c]ourt erroneously refused to offer a jury instruction on [m]anslaughter [and] . . . excluded testimony and exhibits contained in the proffer of witness [Luckett], which would have established clear basis for a heat of passion instruction."  Frazier also maintained the jury verdict was against the weight of the evidence.  On August 16, 2022, the court denied the post-trial motion.  Frazier now appeals, asserting his murder conviction should be reversed and remanded for a new trial.  In the alternative, Frazier argues this Court should order the trial court to hold an evidentiary hearing.

**STANDARD OF REVIEW**

¶21.    We review the refusal of a lesser-included-offense instruction de novo.  *Franklin v. State*, 136 So. 3d 1021, 1026 (¶11) (Miss. 2014) (citing *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013)).  A defendant is entitled to a lesser-included-offense instruction when

---

[14]  All five shell casings contained a caliber designation, indicating a ".45 auto."

there is "evidence in the record from which a jury reasonably could find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense." *Id*. at 1027 (¶11) (quoting *Gilmore*, 119 So. 3d at 286 (¶13)). "We will affirm the refusal of a lesser-included-offense instruction if—viewing the evidence in the light most favorable to the defendant, and drawing all reasonable inferences in his favor—no reasonable jury could have found the defendant not guilty of the indicted offense and yet guilty of the lesser-included offense." *Maye v. State*, 350 So. 3d 263, 268 (¶14) (Miss. Ct. App. 2022) (citing *Gilmore*, 119 So. 3d at 286 (¶13)). The standard of review regarding the admission or exclusion of evidence is abuse of discretion. *Tatum v. Barrentine*, 797 So. 2d 223, 230 (¶12) (Miss. 2001).

## ANALYSIS

I.      **Whether the trial judge erred in not giving a manslaughter instruction.**

¶22.    Frazier argues that the trial court erred by refusing to instruct the jury on the lesser-included offense of heat-of-passion manslaughter. *See* Miss. Code Ann. § 97-3-35. On February 26, 2020, Frazier proposed the following instruction, listed in the record as instruction D-2:

> The [c]ourt instructs the jury that if you find beyond a reasonable doubt from the credible evidence that the [d]efendant did kill the deceased but that same was not done with premeditation or malice aforethought but was done in a sudden heat of passion, then you may find the defendant guilty of manslaughter and the form of your verdict may be: "We, the jury, find the [d]efendant guilty of manslaughter."

Proposed instruction D-6 provided the following:

12

The [c]ourt instructs the [j]ury that if you unanimously find that the State has failed to prove all the elements of the crime of [m]urder, you may then proceed in your deliberations to consider the lesser charge of [m]anslaughter. . . .

Proposed instruction D-7 provided:

"Heat of passion" means a person acts in a state of violent and uncontrollable rage. The person must have been provoked into acting in such a manner by some act(s) or word(s) which would reasonably lead to an angry, hateful, resentful, or terrified emotional state of mind. . . .

Proposed instruction D-8 provided:

If you find that the [s]tate did not prove any one of the elements of [f]irst [d]egree [m]urder, then you must find [Frazier] not guilty of [f]irst [d]egree [m]urder. You will then proceed with your deliberations to decide whether the [s]tate has proved beyond a reasonable doubt all of the elements of the lesser crime of [m]anslaughter.

If you find beyond a reasonable doubt from the evidence in this case that:
1. On or about June 26, 2015, in Coahoma County, Mississippi;
2. [Frazier], unlawfully and without deliberate design killed [Pittman], a human being in the heat of passion, by using a deadly weapon to shoot him;
3. And not in necessary self-defense,

then you shall find [Frazier] guilty of [m]anslaughter. . . .

Proposed instruction D-9 provided:

If you fail to find the [d]efendant guilty of First Degree Murder you may proceed to consider the elements of the lesser offense of Manslaughter.

If you find the [d]efendant guilty of Manslaughter then the form of your verdict shall be: "*We, the Jury, find the Defendant guilty of Manslaughter.*" . . .

¶23. During the jury instruction conference, the following exchange took place:

THE COURT: I think it's pretty clear that nothing untoward occurred at the deposition. It was described as calm, a normal deposition, there were no words exchanged between [Pittman] and [Frazier], no

13

|  |  |
|---|---|
|  | comments of any sort. . . . So the question comes . . . if I give a heat of passion manslaughter instruction, where does the heat of passion originate?  From whence does it come?  Because it does not appear, unless you can point me to something - - that occurred at the deposition, then I don't find it arose through some conduct or action at the deposition.  Would you disagree with that? . . . |
| DEFENSE COUNSEL: | At the conduct of the deposition, we have no evidence that [Frazier] was provoked, but we do have evidence of arousal and anger. |
| THE COURT: | Okay. |
| DEFENSE COUNSEL: | Well, let me take that back.  It's relative because, again, we get into state of mind.  He's sitting at a deposition where he's being sued - - |
| THE COURT: | You tell me - - you tell me - - because heat of passion requires - - it says, "engendered by a blow or certain other provocation." |
| DEFENSE COUNSEL: | Right. |
| THE COURT: | Was there a blow? |
| DEFENSE COUNSEL: | No. |
| THE COURT: | Okay. What occurred at the deposition that would constitute the requisite provocation? |
| DEFENSE COUNSEL: | Our position is the history of the case, which I proffered and you denied to be in front of the jury, and the fact that he had to be there and had to listen and look at this man who has broken him. . . . |
| THE COURT: | All right.  Well, I agree with you that . . . it derived from the litigation itself and the history between the two individuals. . . .  Kind of a long-term, ongoing - - I don't know - - battle of wills, or whatever we want to call it . . . . |

¶24.   Ultimately the judge stated, "[I]f there was passion at the deposition which led [Frazier] to do what he did," it was "something that developed over several months, perhaps years."  The judge found that there was a lack of the "immediacy that seems to be required" and refused the manslaughter instructions, specifically D-2, D-6, D-7, D-8, and D-9.  Frazier

14

asserts that this decision was erroneous and that this Court should reverse and remand for a new trial.

¶25.    This Court has held that the "denial of a manslaughter instruction is proper where the record is clear that the decedent was killed with malice or deliberate design." *Abeyta v. State*, 137 So. 3d 305, 311 (¶12) (Miss. 2014).  "When a deadly weapon is used, as here, malice is implied."  *Turner v. State*, 773 So. 2d 952, 954 (¶7) (Miss. Ct. App. 2000).  "In order to overcome that implication, there must be some evidence in the record from which the jury could determine that the act was not the result of malice, but a result of heat of passion." *Id*. First-degree murder is a killing "done with deliberate design to effect the death of the person killed."  Miss. Code Ann. § 97-3-19(1)(a).  In contrast, heat-of-passion manslaughter is a "killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense."  *Id*. § 97-3-35.

¶26.    "Heat of passion" is defined as "[a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter."  *Agnew v. State*, 783 So. 2d 699, 703 (¶14) (Miss. 2001).  "The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror."  *Maye*, 350 So. 3d at 268 (¶14) (quoting *Jones v. State*, 39 So. 3d 860, 866 (¶36) (Miss. 2010)).  A "primary element [ ] of a heat-of-passion crime is **immediate and reasonable provocation**, by words or acts of one **at the time**."  *Jones*, 39 So. 3d at 866 (¶36) (emphasis added).  The response must be the result of "some insult,

15

provocation, or injury [that] would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation." *Abeyta*, 137 So. 3d at 310 (¶10). "[W]ords alone and disagreements among people are not enough to invoke the passion required for this defense." *Baker v. State*, 304 So. 3d 707, 712 (¶17) (Miss. Ct. App. 2020). Rather, the provocation must "usurp [ ] the mind destroying judgment." *Sanders v. State*, 103 So. 3d 775, 778 (¶11) (Miss. Ct. App. 2012) (quoting *Agnew*, 783 So. 2d at 703-04 (¶14)).

¶27. Here, Frazier used a firearm to kill Pittman at a deposition taken as a result of ongoing litigation between Frazier and Pittman. The use of the firearm means there is an implication of malice. *Turner*, 773 So. 2d at 954 (¶7). Without evidence to the contrary, a heat-of-passion manslaughter jury instruction was not warranted. *Id*. The record repeatedly paints a picture of a "normal," "routine kind of deposition" with "nothing extraordinary about it." No one testified that there were any raised voices, harsh tones, or arguments. No one testified that there was any "odd behavior" by Frazier or that the deposition "evinced any kind of emotion or tension." In fact, the testimony indicates that the "deposition was really more favorable to [Frazier] than it was to [Pittman]." Frazier points to the "history of the case" between Frazier and Pittman as the basis for his heat-of-passion argument. But past acts usually are insufficient to warrant a heat-of-passion instruction because it requires immediacy unless a cooling-off period occurs "between the provocation and the killing." *Sanders*, 103 So. 3d at 779 (¶13). Pittman's initial complaint against Frazier was filed on August 1, 2014, and the deposition occurred on June 26, 2015. Frazier had a "cooling-off

period" of approximately 329 days.

¶28. As the third branch of government, we encourage the citizens of the state and county to resolve their disputes through the court and discourage the use of "vigilante justice." *See Miss. Comm'n on Jud. Perf. v. McGee*, 71 So. 3d 578, 583 (¶9) (Miss. 2011) (holding that a 270-day suspension from office was warranted when the justice court judge used his judicial status to interfere with the prosecution of a crime and openly encouraged vigilante justice, as opposed to using the court system to pursue justice). In fact, reasonable access to the courts is a right guaranteed by the Mississippi Constitution, which provides that "all courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law[.]" *Price v. Clark*, 21 So. 3d 509, 527 (¶47) (Miss. 2009) (quoting Miss. Const. art. 3, § 24). Being involved in the court system as a litigant, while uncomfortable and at times nerve-racking, is not a reasonable provocation sufficient to mitigate a murder to manslaughter. Litigation is a vehicle for the bringing and resolution of disputes between citizens which our courts have long encouraged. Accordingly, the civil litigation then ongoing between Frazier and Pittman, albeit contentious and stressful, was the proper method of handling the parties' disputes and was not sufficient to trigger adequate provocation under our law. Accordingly, there is no evidence in the record from which a jury reasonably could find Frazier not guilty of first-degree murder and at the same time find him guilty of heat-of-passion manslaughter. We affirm as to this issue.

**II. Whether the trial court abused its discretion by excluding portions of Luckett's testimony.**

¶29. Frazier argues the trial court erred by excluding the portion of Luckett's testimony

17

pertaining to the nature of the civil litigation between Frazier and Pittman. After Luckett's direct examination in the first trial, Frazier proffered a portion of Luckett's testimony about the civil litigation along with three exhibits.[15] The exhibits were D-1: the complaint initially filed by Pittman; D-2: Frazier's answer and counterclaim; and D-3: Frazier's second amended counterclaim. During the proffer, Luckett testified that Frazier had placed a "[m]aterialman's lien" on Pittman's home property in the amount of $31,000 due to Pittman's "fail[ure] to pay [Frazier] for work that had been done." On May 20, 2014, Pittman sent a letter to Frazier "threatening a federal lawsuit" under the Fair Debt Collection Practices Act. On August 1, 2014, Pittman sued Frazier for $75,000 in compensatory damages and $75,000 for punitive damages. On August 28, 2014, Frazier responded to the complaint and denied that Pittman was entitled to any relief and further asserted a counterclaim for $100,000 in punitive damages due to Pittman's "bad faith." After the proffer was made, the following discussion took place:

| | |
|---|---|
| LUCKETT: | The effort during the deposition was to try to get some dirt on [Frazier] by asking Dr. Damallie questions about Dr. Damallie's experience with [Frazier] - - |
| THE COURT: | It's my understanding . . . that [Frazier] had done some construction work for him. |
| LUCKETT: | That's right . . . . |
| THE COURT: | How would you describe [Frazier's] demeanor during those conversations . . . the one immediately prior to going over to the deposition? |
| LUCKETT: | [F]rankly, I thought he was a victim and being mistreated . . . and bullied . . . by [Pittman]. . . . But he was calm and |

---

[15] The record is devoid of any motion in limine or order excluding Luckett's testimony. However, on February 14, 2020, during the pretrial motion hearing, the judge stated, "I'm not interested in trying the civil case," with reference to another witness named Katie Hillard, who was ultimately excluded from testifying.

|  |  |  |
|---|---|---|
|  |  | educating me and giving me information. . . . |
| THE COURT: |  | And during the deposition, you would not describe [Frazier's] conduct as irrational? |
| LUCKETT: |  | I would not. |

¶30. On August 8, 2022, during the trial in the instant case, the judge stated the following outside the presence of the jury:

> [W]ith regard to the proffer that was made during [Luckett's] previous testimony, we will not . . . read any of that. It is contained within the transcript . . . it is now a part of this record, although it will not go to the jury.

After Frazier's conviction, on August 12, 2022, Frazier filed a motion for judgment notwithstanding the verdict or, alternatively, a new trial asserting this decision was erroneous. The court denied that motion and stated:

> [T]he court was not going to allow the defense to try the civil case in the criminal proceeding. It was the court's view that because the civil dispute between the parties could not mitigate the murder charge down to . . . manslaughter . . . the details surrounding the basis of the civil litigation were irrelevant to the issue of murder. In addition, and perhaps a failing on the part of the court, but this court could not imagine how bringing in the details of such protracted litigation could be helpful in establishing a defense of manslaughter. If anything, such evidence would lend credence to any malice held by Frazier toward Pittman. Thus, if excluding such evidence was error—and this court does not believe it was—such would be harmless error.

¶31. The Mississippi Rules of Evidence provide that irrelevant evidence, as well as relevant evidence in which the "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence" may be excluded. MRE 402, 403. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

19

be without the evidence." *Hughes v. State*, 735 So. 2d 238, 274 (¶162) (Miss. 1999) (citing MRE 401). "The trial court enjoys substantial deference when determining matters of relevance." *Id*. at (¶164).

¶32. On appeal, Frazier argues, "[T]he court prevented [Frazier] from presenting" evidence that would have supported his heat-of-passion defense "by denying Luckett's testimony" that, if allowed, "would [have] show[n] [Frazier's] actions were classic manslaughter." It is unclear which portion of Luckett's testimony would have been relevant to a heat-of-passion defense. As already explained, no evidence of Frazier's sudden provocation existed in the record. Likewise, there was no such evidence offered in Luckett's excluded testimony. In fact, Luckett reiterated the fact that Frazier was "calm" prior to the deposition. When asked about Frazier's demeanor during the deposition, Luckett stated he "would not" describe Frazier's conduct as irrational. Further, Luckett's opinion that he felt Frazier, his client, was a "victim" in the ongoing civil litigation was not admissible opinion testimony and certainly not evidence of Frazier's "sudden" and "reasonable provocation" that might justify a manslaughter instruction. Ultimately, the trial court found that "because the civil dispute between the parties could not mitigate the murder charge down to . . . manslaughter[,]" the testimony regarding the civil litigation was "irrelevant to the issue of murder." The trial court admitted the portions of Luckett's testimony it deemed relevant and in its discretion excluded that which was irrelevant. Considering the "substantial deference" afforded to these types of decisions, we hold the trial court did not abuse its discretion by excluding a portion of Luckett's testimony.

20

**CONCLUSION**

¶33. The trial court did not err in refusing to give a heat-of-passion manslaughter instruction, and the trial court did not abuse its discretion by excluding portions of Luckett's testimony. Accordingly, we affirm Frazier's conviction and sentence for first-degree murder.

¶34. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**