# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01158-COA

AUDREY JONES A/K/A AUDREY MARQUEZ JONES

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

DATE OF JUDGMENT: 05/10/2018
TRIAL JUDGE: HON. JEFF WEILL SR.
COURT FROM WHICH APPEALED: HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES PHILLIP W. BROADHEAD
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL BY: KAYLYN HAVRILLA McCLINTON
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: REVERSED AND REMANDED - 12/17/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McDONALD AND C. WILSON, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. In 2018, Audrey Jones was convicted of robbing David McCullough and Charlotte Mears in their apartment and then kidnapping Charlotte by making her drive with him to an ATM to withdraw money. For the convictions on two counts of armed robbery in violation of Mississippi Code Annotated section 97-3-79 (Rev. 2014), the Hinds County Circuit Court sentenced Jones to a twenty-five-year term, with ten years suspended and fifteen years to serve, and a consecutive thirty-five-year term, with ten years suspended and twenty-five years

to serve, all in the custody of the Mississippi Department of Corrections (MDOC). The court placed Jones on five years of probation following each term. For the kidnapping conviction in violation of Mississippi Code Annotated section 97-3-53 (Rev. 2014), the court sentenced Jones to a thirty-five-year term in the MDOC's custody, with ten years suspended and twenty-five years to serve, and placed Jones on five years of probation. The circuit court set that sentence to run concurrently with his armed-robbery sentence of a thirty-five year term. Jones appeals. He argues that the court improperly admitted a photographic lineup and surveillance-video evidence in violation of the rules of discovery. He also claims that he was denied a fair trial when the court allowed the State to present evidence of another separate crime for which he had not been tried or convicted. After reviewing the record and relevant precedent, we find that the court erred in admitting the evidence of the second crime because its probative value was substantially outweighed by the undue prejudice caused to Jones. We therefore reverse Jones's convictions and sentences and remand for a new trial.

**Facts**

¶2. On April 16, 2016, a gunman followed Charlotte and her ex-husband and roommate David into their apartment. The gunman ordered them to get on the floor while he looked through the apartment. He found some laptops and bank cards and demanded their passwords and PIN numbers. Ultimately, he ordered David into the bathroom, took David's cell phone, and left the apartment with Charlotte.

¶3. The gunman forced Charlotte to drive her car to a bank and withdraw $500 from an ATM. This was captured on the bank's surveillance video. When the PIN number that

2

David had given for his bank cards did not work, the gunman became angry and said he planned to return to the apartment and beat David. Meanwhile, David had left the bathroom and gone to other apartments to find help. At a neighbor's apartment, he was able to call his daughter and the police. Anxious about Charlotte's safety, David did not wait for the police to arrive. He drove around to find her himself.

¶4. After leaving the bank, Charlotte drove according to the gunman's directions. He ordered her to park, took the keys, and threatened to kill her if she left the car. He then got out of the car and went over a fence. When Charlotte realized that she was not far from her own apartment complex, she mustered the courage to get out and run. She waved down a vehicle driven by Tameka Reed and Gregory Scott. They took her home where she found the police and her daughter. Ultimately, David returned from his futile search and was reunited with Charlotte.

¶5. David and Charlotte told the police what had happened. They described the gunman as a black man who wore a black, green and yellow knit cap. The police inspected Charlotte's car and took fingerprints. They also fingerprinted the apartment and the iPad that the gunman had handled. The results of the fingerprint tests did not come back from the lab until the middle of the trial. None of the fingerprints matched Jones's.

¶6. On April 20, 2016, the police asked Charlotte to review two separate photographic lineups that did not include a picture of Jones, but she could not identify the gunman in either of them.

¶7. Incident to a subsequent robbery whose suspect was captured on surveillance footage

3

at a bank and nearby gas station, police identified a suspect and a vehicle that belonged to Jones. After Jones was arrested, authorities executed a search warrant on Jones's home. They seized almost one hundred items, but nothing that belonged to Charlotte or David.

¶8. On April 29, 2016, the police asked David and Charlotte to review more photographic lineups. Charlotte refused, but David went and identified Jones as the gunman.

¶9. In November 2016, Jones was indicted and charged with two counts of armed robbery and one count of kidnapping. Jones filed a motion for discovery that, among other things, requested the disclosure of all physical evidence that would be used against him and any exculpatory material. Prior to trial, he also filed a motion in limine to exclude past criminal convictions, pending charges, and other evidence of prior bad acts.

¶10. On the first day of the trial, May 7, 2018, the State announced that it had just acquired the ATM video showing Charlotte's forced withdrawal. The State also told the court that it was still waiting on the test results of the fingerprints collected from an iPad at the victims' home. The State explained that all the evidence was not ready because as of the Friday before, Jones was contemplating pleading guilty. Jones's attorney said that he had no issue with the late disclosure of the ATM video because it had been referenced in discovery, and he just wanted to view it before making an announcement to the court. The video showed Charlotte driving in her car up to an ATM and withdrawing money. It was impossible to identify who was in the car with her. When the court reconvened, Jones's attorney announced that he was ready to proceed.

¶11. The court then considered Jones's motion to exclude evidence of other bad acts. The

4

State told the court that at the time of Charlotte and David's robbery, there was a "crime spree" going on: there were other robberies in the same area, and a kidnapping and rape occurred where the perpetrator also had forced his way into people's apartments, placed one into a bathroom, threatened the other, and took bank cards. After Jones's attorney objected to any testimony regarding the other cases, the State said:

> We weren't going to go into--these were the allegations, simply that there were several open cases going on at the same time in which the description and the MO [modus operandi] of the case -- commission of the case -- were very similar; and that in the last case, it resulted in the identification of the defendant; and that's how the arrest was finally made.

The court accepted the State's representations and denied Jones's motion but cautioned the State to talk to its witnesses to insure that they did not "blurt out what the nature of the charges were." The State agreed, and the trial commenced.

¶12. Testifying for the State were the victims, David and Charlotte, the responding police officer Jennifer Avery, and Tameka Reed, who had picked up Charlotte and driven her home. David described what happened and continued that he had identified Jones as the gunman in a photographic lineup that was entered without objection. David also identified Jones in court.

¶13. When Charlotte testified, she described as a light-skinned black man with "little dreads on top of his head." She said he looked nice, and she could not believe he was doing this. She also identified Jones in court as the gunman.

¶14. During Charlotte's testimony, the State sought to enter the ATM video of her and the gunman's visit to the ATM. Jones's attorney objected, not because of any late disclosure,

5

but because Charlotte, he argued, could not authenticate the video. The court overruled the objection, and the video was entered into evidence and played before the jury. While Charlotte is clearly shown on the video, it is impossible to determine the person in the passenger seat.

¶15.   Charlotte also testified that on April 20, 2016, she visited police headquarters and spoke to Detective Maurice Young. She said she was presented a two-page photographic lineup but that she did not recognize anyone on them. The State then showed Charlotte a photographic lineup and sought to introduce it into evidence.[1] Jones's attorney objected that the photographic lineup had not been provided in discovery. The court overruled the objection and admitted the second photographic lineup into evidence. The lineup itself does not include Jones's picture, and Charlotte testified that she could not identify the gunman in the lineup.

¶16.   Reed, whom Charlotte had flagged down for assistance, testified that when Charlotte got in her car, Charlotte said she had been kidnaped by a man with dreads. But Reed also admitted that she did not put that in the statement she gave to police on the day of the crime.

¶17.   Prior to calling its next witness, outside of the presence of the jury, the State informed the court that the results of the fingerprint evidence had come in during lunch, and none of the fingerprints collected matched Jones's. Jones's attorney moved to dismiss the charges because the results had not been provided to the defense prior to trial. The State argued, among other things, that at the beginning of the trial Jones had agreed to proceed even

_____

[1] Unlike the photographic lineup presented to David, which includes the date it was compiled,  there is no date on the photographic lineup that Charlotte was shown.

6

though the fingerprint results had not yet been received. The court took the matter under advisement, but the issue was never revisited, and the fingerprint evidence was never introduced.[2]

¶18. The State's next three witnesses testified to evidence obtained through the investigation of the later robbery that bore some similarities to David and Charlotte's. None of the witnesses were involved in the investigation of David and Charlotte's robbery, and they had not been disclosed as potential witnesses during Jones's trial. Before the first witness, Detective Jamie White, testified, Jones's attorney objected and reminded the court of its ruling on Jones's motion in limine concerning evidence of other bad acts. Before ruling on the objection, the court asked the State to question White outside the presence of the jury. After the State complied, defense counsel additionally objected that the testimony was prejudicial and unnecessary. The court overruled the objection, and the jury was brought back to hear White's testimony in full.

¶19. White testified that he was not involved in the investigation of the crime against David and Charlotte, but he investigated a later robbery that occurred at the same apartment complex on April 25, 2016. White testified that both robberies involved the same modus operandi (MO) and he went further to describe what that MO was—namely, that a gunman approached victims from outside their apartments and then forced them inside; that he separated victims, putting one in the bathroom while threatening to kill the other; and that

---

[2] Nonetheless, during defense counsel's closing argument, he noted the State's failure to produce fingerprint evidence to the jury, saying, among other things, "If the State found Mr. Jones's fingerprints in that car or in the house, why didn't you hear about it?"

he took items like debit cards and demanded that the victims disclose the PIN numbers.

¶20. White went further to testify about his investigation of the later robbery. The victims of that robbery had described the gunman's clothing and later provided White their bank statements. From the statements, White determined that someone had attempted to withdraw money from a BankPlus ATM on Adkins Road in Jackson. White then secured surveillance footage from BankPlus and from a gas station across the street.[3]

¶21. White testified that the person depicted in the ATM video was wearing a jacket similar to the one described by the victims of the later robbery. From the gas station video, again using the victims' description of the jacket the gunman wore, White identified the type of car he concluded the suspect drove. From further investigation about the car, police identified and arrested Jones. Jones's attorney renewed his objections to the tapes, which were again overruled, and both videos were played for the jury. As the videos were being played, White described the events depicted in them. The ATM video clearly showed the face of the individual attempting to make the withdrawals. After White blurted out that the individual was Jones, defense counsel objected. The court sustained the objection and instructed the jury to disregard White's comment.

¶22. In addition to testifying to the content of the videos that were shown to the jury, White further pointed out that the person in the ATM video wore a t-shirt that said "Tuesday Morning" on it. Tuesday Morning is a retail store, and White testified that he followed up

---

[3] During the proffer, Jones's attorney vigorously objected to the introduction of these tapes because they had not been provided to Jones before trial. The State said that its investigator had just brought the bank ATM video in that morning. The court overruled Jones's objection.

8

with the store and learned that Jones had previously worked there.

¶23. White went on to testify that during the investigation of the latter robbery, a search warrant was obtained for Jones's apartment. Among the items found was the jacket that White testified was the jacket worn by the suspect in the second robbery. White identified the jacket itself, which was admitted into evidence over Jones's objection.

¶24. White then testified that after Jones was arrested, authorities contacted the Mississippi Bureau of Investigation, which has access to driver's license records, to get a photo of Jones. Authorities then created a six person photographic lineup to be presented to the victims of the latter robbery. Notably, White was never shown the lineup that was presented to David to determine whether it was the one that White had generated.

¶25. On cross-examination, White admitted that the gas station video, the second ATM video, the pictures taken during the search, and the jacket were evidence obtained for another case altogether—not the case being tried. White also admitted that he was not sure if any of the items retrieved from the search were stolen from Charlotte and David.

¶26. The State next called Crime Scene Investigator Mamie Barrett, who conducted the search of Jones's apartment incident to the investigation of the latter robbery. Barrett testified that on April 28, 2016, she was tasked with executing a search warrant at the home of Audrey Jones. The State sought to enter photographs of the apartment and its contents, and Jones objected that the photographs were irrelevant. The court took out four photographs depicting several guns found in the apartment, as well as photographs of Jones's car, but overruled Jones's objection and allowed the rest. The forty pictures that remained

depicted clothing, a pill bottle with someone else's name on it, iPads, an Apple laptop, several watches, an iron, an Xbox game system with someone else's name and address on it, money, and sunglasses. Also included was a picture of a small handgun; however, it was never identified by David or Charlotte as the one that the gunman used when he robbed them. Barrett testified that the serial numbers of the electronics she found in Jones's apartment did not match those of any known stolen items in any case.

¶27. The State also called Officer Dejohn Arterberry, who testified that on April 28, 2016, he had viewed the surveillance video from the gas station that was obtained in the investigation of the later robbery. Arterberry saw what the car looked like and began looking around various apartment complexes in the area of the robbery until he found the vehicle. He was told the apartment number of the owner and Arterberry proceeded there. He knocked on the door, and a young black male opened it. Arterberry asked him if he owned the vehicle, and the young man tried to close and lock the door. Officers then entered and apprehended Jones.[4]

¶28. After the State rested, the defense called no witnesses, and Jones elected not to testify. The jury instructions included a limiting instruction regarding the use of evidence of other bad acts. The jury deliberated and found Jones guilty of all charges.

¶29. Jones filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial in which he stated, among other things, that during discovery he was not provided with Charlotte's statements taken by the police and that the court had erroneously admitted

---

[4] Jones's continuing objection to the testimony of White, Barrett and Arterberry was noted by the court.

10

White's testimony about "other unindicted and unrelated alleged crimes." The court denied Jones's motion. Jones now appeals and argues (1) that evidence of the Charlotte's photographic lineup and the surveillance videos and other evidence from the later robbery should have been excluded because they were not produced during discovery and (2) that the admission of other-bad-acts evidence violated his right to a fair trial.

**Standard of Review**

¶30. In determining whether a trial court made an erroneous ruling on the admission or suppression of evidence, we employ an abuse-of-discretion standard. *Cole v. State*, 126 So. 3d 880, 883 (¶13) (Miss. 2013). "[J]udicial discretion is not boundless but is defined as a sound judgment which is not exercised arbitrarily, but with regard to what is right and equitable in circumstances and law, and which is directed by the reasoning conscience of the trial judge to just result." *Sanford v. Dudley*, 196 So. 3d 1106, 1112 (¶19) (Miss. Ct. App. 2016). An abuse of discretion may be found where "the reviewing court has a definite and firm conviction that the court below committed a clear error of judgment and in the conclusion it reached upon a weighing of the relevant factors." *Magee v. State*, 231 So. 3d 243, 249 (¶12) (Miss. Ct. App. 2017). The reversal of a trial court's ruling requires a showing that the admission or exclusion of evidence resulted in prejudice or harm to the defense. *Pittman v. State*, 904 So. 2d 1185, 1193 (¶18) (Miss. Ct. App. 2004). We review for Confrontation Clause errors de novo. *Smith v. State*, 986 So. 2d 290, 296 (¶18) (Miss. 2008).

11

**Discussion**

¶31.    Even though Jones also argues discovery violations occurred, we find that the court's error in the admission of evidence relating to the later robbery is dispositive of this appeal. Jones contends, and we agree, that the evidence and testimony relating to the second robbery was inadmissible under Mississippi Rule of Evidence 403. The court allowed testimony and evidence that we find was based in large part on inadmissible hearsay testimony from Detective White that denied Jones his constitutional right to confront the witnesses against him. The probative value of evidence from the latter robbery as presented was outweighed by the unfair prejudice to Jones. This is not an instance of harmless error but one that warrants reversal.

**I.    Summary of the Relevant Law**

¶32.    To be admitted, evidence must first be relevant to the issues in the case. *Pittman*, 904 So. 2d at 1193 (¶18) (Miss. Ct. App. 2004). Mississippi Rule of Evidence 401 states that evidence is relevant if it has a tendency to make a fact more or less probable than it would be without the evidence and if it is of consequence in determining the case. "A cornerstone of evidence admissibility is its relevance. Evidence is relevant if it tends to make a fact more or less probable and that fact is consequential in determining the case." *Phillips v. State*, No. 2017-KA-00901-COA, 2019 WL 2511572, at *4 (Miss. Ct. App. June 18, 2019).

¶33.    As a general rule, evidence of a crime other than the one for which the accused is being tried is not admissible. *Ladner v. State*, 584 So. 2d 743, 758 (Miss. 1991) ("The general rule is that evidence must be limited to the criminal activity charged in the indictment

12

and evidence of other crimes must be excluded."). "The accused in fairness can only be expected to meet the accusations of the indictment, and is favored throughout with the presumption of innocence of even those accusations." R. P. Davis, Admissibility in Robbery Prosecution of Evidence of Other Robberies, 42 A.L.R.2d 854 § 3 (Supp. 2019).

¶34. Mississippi Rule of Evidence 404(b) prescribes when other bad acts evidence may and may not be used:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Evidence of other bad acts is only admissible if it is relevant to an issue in the case being tried and if the prosecutor clearly articulates the alternative purpose for the evidence, showing that a Rule 404(b) exception is met. *Strickland v. State*, 220 So. 3d 1027, 1033-34 (¶¶15-16) (Miss. Ct. App. 2016).

¶35. But evidence that may be admissible under Rules 401 and 404(b)(2) is still subject to the Rule 403 balancing test. *Pitchford v. State*, 45 So. 3d 216, 246 (¶125) (Miss. 2010). Rule 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Thus, the court must balance the probative value of the otherwise admissible bad-acts

evidence against, among other things, its unfair prejudice to the defendant.

> The more probative the evidence is, the less likely it is that a [Rule] 403 factor will be of sufficient consequence to substantially outweigh the probative value. On the other hand, the less probative value the evidence has, the less significant the 403 factor would have to be to justify exclusion.

*Brown v. State*, 749 So. 2d 204, 210 (¶10) (Miss. Ct. App. 1999).

¶36. When evidence of other bad acts is admissible, the trial court must give an instruction to the jury explaining the limited purposes for which that evidence may be considered. *Anderson v. State*, 2018-KA-00312-COA, 2019 WL 4267754, at *4 (¶16) (Miss. Ct. App. September 10, 2019) (citing *Derouen v. State*, 994 So. 2d 748, 756 (¶20) (Miss. 2008)). But "if the inadmissible testimony is so damaging that its effect upon the jury could not be adequately tempered by admonition or instruction; the trial court should grant a mistrial." *Brown*, 749 So. 2d at 209 (¶7).

¶37. Finally, reversal is required only where the court's abuse of discretion can be shown to cause prejudice to the defendant. *Franklin v. State*, 136 So. 3d 1021, 1028 (¶22) (Miss. 2014). Such prejudice can be shown if a defendant is denied his constitutional right to confront the witnesses against him. *Smith v. State*, 986 So. 2d 290, 294 (¶10) (Miss. 2008). Each case must stand on its own facts in determining whether particular error constitutes reversible error. *Carleton v. State*, 425 So. 2d 1036, 1041 (Miss. 1983), *overruled on other grounds by Payton v. State*, 785 So. 2d 267, 270 (¶11) (Miss. 1999); *Henderson v. State*, 403 So. 2d 139, 140 (Miss. 1981).

### B. Application of the Law

¶38. In this case, Jones filed a pretrial motion in limine to exclude any evidence of other

14

crimes or bad acts. The court heard argument before the trial began. The State argued that the evidence from the latter robbery was admissible under Rule 404(b) because: (1) the evidence was necessary to explain to the jury how Jones's photo came to be included in David's photo lineup; and (2) the evidence showed an MO similar to the armed robbery at issue. The court accepted the State's reasons and denied the motion with the caveat that the State's witnesses could not give specifics of the second crime. We find that White's narrative of the evidence in the latter robbery was based on hearsay statements of the victims who did not testify at trial. The admission of that hearsay evidence denied Jones his constitutional right of confrontation. Further, the court's admission of testimony and other evidence concerning the later robbery was an abuse of its discretion because the unfair prejudice to Jones substantially outweighed the probative value of the evidence admitted.

1.      Impermissible Hearsay and Narrative in White's Testimony Violated Jones's Right to Confrontation

¶39.    The testimonial hearsay contained in White's testimony about the later robbery is troublesome. Mississippi Rule of Evidence 801(c) defines "hearsay" as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." For example, in a felony child abuse case, *German v. State*, 30 So. 3d 348, 352 (¶10) (Miss. Ct. App. 2009), the investigating detective was asked about the injuries he observed and he responded that "you will see the redness which was described to me by the doctors as blood beginning to pool behind her eyelids." We found this to be hearsay. *Id.* at (¶12).

15

¶40. The admissibility of law enforcement's testimony that refers to victims' statements depends on whether it is offered to prove a fact (testimonial hearsay) or whether it is offered merely to show why the officer acted as he did (nontestimonial hearsay). In *Birkley v. State*, 203 So. 3d 689, 696 (¶16) (Miss. Ct. App. 2016), an officer investigating a store robbery testified that he showed the store's surveillance-tape photo to another officer, who identified the suspect as someone he had stopped for warrants. We found this testimony was admissible because "it explained an officer's course of investigation or motivation for the next investigatory step by that officer." *Id.* But when testimony is given to prove the truth of a fact, the officer's reference to statements made to him by the victims becomes inadmissible testimonial hearsay which must be filtered through the Confrontation Clause. *See Smith v. State*, 986 So. 2d 290, 297 (¶20) (Miss. 2008). The United States Supreme Court has noted that "there are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Lee v. Illinois*, 476 U.S. 530, 540 (1986).

¶41. In this case, had Jones been on trial for the later robbery, White's hearsay testimony about what the victims told him may have been admissible to show how it directed him in the investigation of that crime. But even then the victims of that crime would need to testify at trial. In *Anderson v. State*, 1 So. 3d 905, 914-15 (¶¶24, 27) (Miss. Ct. App. 2008), we held that an officer could testify to the descriptions given by the aggravated-assault victims who had identified Anderson as the shooter when the officer was putting together a photo lineup

for the case because not only he, but also the victims, testified at trial. We cautioned that "where the out-of-court statement is "testimonial" in nature, the statement is generally not admissible unless the declarant is unavailable to testify in court, and the defendant has had a prior opportunity to cross-examine him or her. *Id*. at 914-15 (¶25) (citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004)). In *Anderson*, we found the defendant had the opportunity to cross-examine the victims as well as the officer, so the officer's testimony about their assailant's description was not admitted to prove the truth of the matter, but to explain the next step in the officer's investigation. *Id*. at 915 (¶27).

¶42.    Unlike the testimony in *Anderson*, White's testimony regarding his investigation of the latter robbery *was* given the prove a key fact—that man shown in the ATM and gas station videos was the perpetrator of the later robbery. Without the victims of the latter robbery testifying to this fact, White's assertion amounts to testimonial hearsay.

¶43.    This extends to White's testimony concerning the jacket worn by the gunman and the bank statements belonging to the victims of the later robbery. White testified that the victims of the later robbery described the jacket as gray and patchy with a green liner. White also testified that he identified the ATM used by the second gunman from the victims' card statements. White's testimony about both the jacket and the card statements was offered for the truth of the matters asserted. At one point, while showing the ATM video, White pointed out to the jury that the jacket the suspect was wearing matched the description given by the victims of the later robbery.[5] Therefore, White's testimony that Jones's jacket was the same

_____

[5] Defense counsel objected to White's testimony during the proffer and the court acknowledged his continuing objection when White testified before the jury. Although not

jacket worn by the perpetrator of the later robbery, and that the person making the withdrawal

at the ATM was that gunman, was rank testimonial hearsay to prove these critical facts.

¶44.    Moreover, White's narrative of the videos and his comments on the evidence

introduced was also impermissible because, interspersed with hearsay from the victims of the

later robbery, it also included White's personal interpretation of what the jury was watching.

> It is permissible for a witness to narrate video evidence when the narration simply describes what is occurring in the video, but it is impermissible if the witness attempts to place his own subjective interpretation of events transpiring in the video based on nothing beyond the witness's own inspection of the contents of the videotape.

*Land v. State*, 198 So. 3d 388, 391(¶9) (Miss. Ct. App. 2016) (internal quotation marks

omitted.

¶45.    White identified the individual shown in the gas station video as the gunman in later

---

explicitly raised, we find that Jones's continuing objection to all evidence admitted concerning the later robbery encompassed an objection on the basis of hearsay.  Thus the issue is not procedurally barred, *Smith v. State*, 925 So. 2d 825, 835 (¶26) (Miss. 2006). Even if it were, we may still consider it under the "plain error doctrine." *Starr v. State*, 997 So. 2d 262, 266 (¶11) (Miss. Ct. App. 2008).   "Under the plain-error doctrine, we can recognize obvious error [that] was not properly raised by the defendant on appeal, and which affects a defendant's fundamental, substantive right." *Fullilove v. State*, 101 So. 3d 669, 675 (¶21) (2012) (internal quotation marks omitted).  The plain-error doctrine must be applied only when certain conditions are met, such as when a violation "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Starr*, 997 So. 2d at 266 (¶12).   Additionally, "[p]lain-error review is properly utilized for 'correcting obvious instances of injustice or misapplied law.'" *Bowdry v. State*, 158 So. 3d 354, 356 (¶6) (Miss. Ct. App. 2014) (quoting *Smith*, 986 So. 2d at 294 (¶10)).  "To determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial." *Bowdry,* 158 So. 3d at 356 (¶7) (citing *Hurt v. State*, 34 So. 3d 1191, 1197 (¶17) (Miss. Ct. App. 2009)).  Here we find the trial court did deviate from the rules of evidence in allowing White's inadmissible hearsay testimony and that this error is clear and prejudiced the outcome of Jones's trial.

robbery because White concluded he was wearing the jacket described by the victims:

> Q. Detective, I'm gonna play the video. I'm gonna be asking you some questions about them as I play them. Just sort of describe for me what is happening.
>
> . . . .
>
> A. Okay. So what you're seeing there is the suspect vehicle pulling up. . . . If you'll watch when he gets out, you can see the inside lining of his jacket. *It's that lime-green yellow color that the victim's* [*sic*] *described.* As well as you can see the red Tuesday Morning shirt hanging out; whenever he gets out of the car to walk over to the ATM.

(Emphasis added).

¶46.    Through this testimony, White was relaying to the jury what the victims of the later robbery allegedly told him and his conclusion that the jacket in the video was in fact the jacket worn by the gunman during the later robbery. But only the victims could testify that it was in fact the same jacket. The State persisted, however, to present White's conclusions as fact:

> Q. Okay. I'm gonna start it again, and you can tell us as we're seeing it.
>
> A. You can see the lining of the jacket there; the splotchy gray jacket, and you can kind of see the red of the Tuesday Morning shirt.
>
> Q. Where -- do you now know where he's heading to?
>
> A. Yeah. He's headed across the street. You can see he goes across the Street to the ATM across the street. And then you've got the timestamp on the ATM where he makes transactions. And you can see his face and everything, clearly, from the ATM camera.

¶47.    The State then moved on to the ATM video:

> Q. Okay. I'm gonna play for you the [ATM video]. And if you can just kind of do what we just did before, answer any questions about it.

19

A.      Okay.

(Whereupon video played.)

Q.      Okay. So what are we looking at?

A.      That's Mr. Jones. He's gonna take the credit cards out there. And you
        can see - -

Defense counsel:     Objection, Your Honor. . . .

Jones's attorney, objected to White's identifying Jones as the perpetrator of the later robbery.

The court instructed the jury to disregard White's comment, but the damage had been done.

The State continued:

Q.      Okay, Detective.

A.      Yes, ma'am.

Q.      Now, if you can look and tell us what we're looking at?

A.      That's the suspect there. You can see the Tuesday Morning shirt right
        there. He's got the jacket on as he gets out of the car. The glasses in the
        scene look like the same glasses that we found when we executed the
        search warrant on his apartment. . . .

Thus, White concluded that the glasses found in Jones's apartment were the glasses worn by

the individual that White had identified as the perpetrator of the later robbery.

¶48.    Finally, when shown a photo of a jacket found in Jones's apartment, White opined that

it was in fact the jacket worn by the gunman in the later robbery:

Q.      I'm gonna show you a picture that's been previously introduced into
        evidence. . . . Can you tell me if you recognize that photograph. Do you
        recognize that photograph?

A.      That's the jacket that he was wearing. I got kind of excited whenever
        we saw that in the closet, because it's the jacket that's in the video, it's
        the jacket that they described. And that's just hanging there in his

closet. It was just perfect. . . .

¶49.    Jones's right to confront the witnesses against him was violated when the State presented impermissible testimonial hearsay about key elements of the latter robbery through White, instead of calling the actual victims as witnesses.  The Confrontation Clause in the Sixth Amendment of the United States Constitution, in the relevant part, provides as follows: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him . . . ."  The admissibility of such evidence is governed by the United States Supreme Court's rationale in *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004), in which the Court held that the out-of-court statements by witnesses that are testimonial in nature are barred, under the Confrontation Clause, unless the witnesses are available at trial, or if unavailable, the defendants had a prior opportunity to cross-examine the witnesses, and irrespective of whether such statements are deemed reliable by the court. *Crawford*, 541 U.S. at 68-69.  "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" *Id*. at 60.  In *Crawford*, the statement at issue was one given by the accused's wife to law enforcement; in finding that it should have been excluded, the Supreme Court said, "The Framers would be astounded to learn that ex parte testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers.  But even if the court's assessment of the officer's motives was accurate, it says nothing about [the accused's wife's] perception of her situation. Only cross-examination could reveal that." *Id*. at 66.

¶50.    Well before *Crawford*, our supreme court held that "[t]he right of confrontation and

21

cross-examination extends to and includes the right to fully cross-examine the witness on every material point relating to the issue to be determined that would have bearing on the credibility of the witness and the weight and worth of his testimony." *Myers v. State*, 296 So. 2d 695, 700 (Miss. 1974). Here, when White's testimony and the evidence of the later robbery was admitted, Jones was denied his right to confront and cross-examine the real witnesses against him, the victims in the later robbery.

### 2. Rule 403 Balancing Test

¶51. Even if White's testimony did not contain inadmissible hearsay and narrative, and even if the evidence of the later robbery qualified as a Rule 404(b)(2) exception, it fails to pass the Rule 403 balancing test. To reiterate, Rule 403 allows courts to exclude otherwise relevant evidence if its probative value is substantially outweighed by the danger of, among other things, unfair prejudice to the defendant. In *Birkley*, we held:

> The reason for Rule 404(b) is to prevent the State from raising the inference that the accused has committed other crimes and is therefore likely to be guilty of the offense charged. The admission of Birkley's prior armed robberies under Rule 404(b) was more prejudicial than probative and constitutes reversible error, and we remand for a new trial consistent with this opinion.

*Birkley*, 203 So. 3d at 695 (¶13). There, Birkley challenged the admission of his prior *convictions* of armed robbery. Here, Jones had not even been charged for, let alone convicted of, the latter robbery.

¶52. Clearly, the State here was trying two cases in one. The Mississippi Supreme Court condemned such a trial strategy in *Flowers v. State*, 773 So. 2d 309 (Miss. 2000). There, Flowers was accused of killing four people in a furniture store fire. *Id*. at 312 (¶5). When Flowers asked for the cases to be consolidated for trial, the State objected and trial proceeded

22

on the murder of Bertha Tardy. *Id.* But throughout the trial, the State elicited testimony about all four victims. *Id.* at 318-22 (¶¶26-39). Photographs of other victims were entered into evidence even though Tardy's body was found some distance from the others. *Id*. at 320-21 (¶31). One witness was asked to describe the sounds one dying victim made, *id*. at 322 (¶38); another witness was asked about shell casings found near other victims. *Id*. at 323 (¶42). Our supreme court said:

> We fail to see any probative value of the testimony and exhibits remotely relevant to the indictment charging capital murder of Tardy. The evidence, both testimony and exhibits, is irrelevant. It appears that the only reason such photographs, slides and accompanying testimony unrelated to Tardy's murder were offered by the prosecution was to show that Flowers, in fact, killed four people rather than only one. We can only conclude that the admission of such evidence was highly prejudicial to Flowers.

*Id*. (¶43). Further, the Supreme Court recognized that often cases are so inter-connected as to be part of the same transaction, but the case before it was not one of those cases. *Id*. at 324 (¶47). The Court concluded:

> Here, we find that while any one of the single incidents complained about by Flowers, standing alone constitutes reversible error, yet the cumulative effect of the prosecutor's pattern of repeatedly citing to the killing of the other three victims throughout the guilt phase proceedings leads us to hold that Flowers was absolutely denied a fundamental right to a fair trial.

*Id*. at 325 (¶52).

¶53. Similarly, in the case at hand, we find that Jones was denied a fair trial. The testimony concerning the later robbery was not needed; the State had two witnesses, Charlotte and David, who identified Jones as the gunman. The only evidence entered relating to Charlotte's and David's robbery was their testimony, the brief testimony of the responding officer to their robbery and that of the driver who picked up Charlotte, the photos of

Charlotte and David's apartment and Charlotte's car, the photo lineups, and the ATM video showing Charlotte making a withdrawal. Everything else dealt with the latter robbery, including testimony from White and two other officers, the second ATM video, the gas station video, forty photos of items taken in the search of Jones's apartment, including one depicting a gun that no one identified as the weapon used during the robberies charged in the indictment, fourteen photos of Jones's car, and the jacket. Most importantly, the victims of the later robbery did not testify to any of the physical evidence or to identify Jones as the person who robbed them. Thus, Jones was denied his right to confront and cross-examine them. Balancing any probative value of this evidence against its prejudice to the defense, we find that all testimony related to the later robbery should have been excluded under Rule 403.

### 3. Prejudicial Error

¶54. When faced with an error, this Court must review the record de novo to determine whether reversal is warranted. *Williams v. State*, 991 So. 2d 593, 599 (¶20) (Miss. 2008). "Harmless errors are those which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring automatic reversal of the conviction." *Id.* "Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case." *Bell v. State*, 2017-KA-01280-COA, 2019 WL 2754819, at *11 ((Miss. Ct. App. July 2, 2019). In addition, "individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss.

24

2007).

¶55. Relevant factors in determining whether an error is harmless or prejudicial in a case of cumulative errors include "whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." *Id*. For example, in *Gilmore v. State*, 119 So. 3d 278, 283 (¶2) (Miss. 2013). Gilmore fought with the victim over proceeds from a concert and shot him. On cross-examination, the State questioned Gilmore about his conviction for simple assault that had occurred in Louisiana five years before. *Id*. at 288 (¶22). Ultimately, Gilmore was found guilty of aggravated assault and appealed. *Id.* at 284 (¶7). Our supreme court found that the Louisiana conviction was not admissible. *Id.* at 290 (¶30). The court went further and found the error not to be harmless, saying:

> the aggravated-assault charge is a grave offense for which Gilmore was sentenced to twenty years' imprisonment. The State acknowledges that it, not Gilmore, first sought to put Gilmore's character at issue by asking whether he was a violent person in order to impeach him with his prior conviction. As the State candidly points out in its brief, we have held previously that such "impeachment is impermissible and grounds for reversal and remand." The introduction of Gilmore's prior battery conviction was not harmless error, and Gilmore is entitled to a new trial on both the aggravated-assault and felony-possession charges.

*Id*. at 291 (¶37) (citation omitted).

¶56. The supreme court reached a similar result in *Baskin v. State*, 145 So. 3d 601, 606-07 (¶31) (Miss. 2014), where it held that the erroneous admission of a conviction for impeachment purposes was reversible error. Baskin had been charged with possession of cocaine and presented a witness in his defense whose testimony contradicted that of law enforcement. *Id*. at 602 (¶5). The State was allowed to impeach the witness with a prior misdemeanor conviction for embezzlement and larceny. *Id*. at 604 (¶19). Finding this to be

25

reversible error, the supreme court said, "[w]e cannot say that it is apparent from the record that a fair-minded jury could have reached no other result than guilty when the State relied on directly contradicted testimony and the trial judge's error directly affected that jury's perception of the contradicting witness's credibility." *Id*. at 606-07 (¶31). The case was remanded for a new trial.

¶57. Here, we find the court's error in admitting White's testimonial hearsay and the physical evidence of the later robbery is not harmless but reversible error because it violated Jones's constitutional right to confrontation and because its probative value was substantially outweighed by the unfair prejudice to Jones. This inadmissible evidence was not trivial or academic, but was a major part of the State's case against Jones that affected the final result. While a jury may have convicted Jones without the impermissible evidence, it is impossible to say that the jury was not unduly influenced by the sheer volume of evidence about the later robbery that was entered. There was no fingerprint testimony presented, and no items found in Jones's apartment that could be linked to David or Charlotte. Moreover, the manner of the presentation of the evidence of the later robbery (i.e., "proving" that Jones committed it through a detective's conclusion-fraught testimony rather than through testimony of the victims) violated Jones's constitutional right to confront the witnesses against him. "The right to confrontation . . . forces the witness to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth [and] permits the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility." *Smith*, 986 So. 2d at 296 (¶19) (quoting *Lee v. Illinois*, 476 U.S. 530, 540 (1986)). Denial of this constitutional right weighs heavily towards

26

reversal. Finally, Jones was charged with two counts of armed robbery and one count of kidnapping—grave offenses indeed—and he was effectively sentenced to at least forty years in prison. If we impose such a sentence on an individual, it must come as a result of a fair trial. Accordingly, we find that the trial court's error in admitting evidence of the later robbery was not harmless but warrants reversal.

## CONCLUSION

¶58. For the above reasons, we hereby reverse Jones's convictions and sentences and remand his case for a new trial.

¶59. **REVERSED AND REMANDED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY TINDELL, J.**

**CARLTON, P.J., DISSENTING:**

¶60. I respectfully dissent from the majority's finding that the trial court erred in admitting evidence relating to the later robbery. The majority found that this admission of evidence denied Jones his constitutional right to confrontation and the probative value of the evidence admitted was substantially outweighed by the prejudice to Jones. I disagree.

¶61. On appeal, "[w]e review the trial court's admission of evidence for an abuse of discretion." *Johnson v. State*, 252 So. 3d 50, 53 (¶7) (Miss. Ct. App. 2018). "We will not reverse the trial court's evidentiary ruling unless the error adversely affects a substantial right of a party." *Id*.

¶62. Mississippi Rule of Evidence 404(b) provides that "[e]vidence of crimes, wrongs, or

27

acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." However, "[e]vidence of prior bad acts may be admissible if its probative value outweighs its prejudicial effect and if it is offered "for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Birkley v. State*, 203 So. 3d 689, 692-93 (¶8) (Miss. Ct. App. 2016) (quoting M.R.E. 404(b)); *see also Fisher v. State*, 532 So. 2d 992, 999-1000 (Miss. 1988) (holding that evidence of the defendant's modus operandi (MO) was admissible under Rule 404(b)); *Wilson v. State*, 149 So. 3d 544, 553 (¶35) (Miss. Ct. App. 2014).

¶63.    In a hearing on Jones's pretrial motion in limine to exclude any evidence of other crimes or bad acts, the State argued that the evidence from the later robbery was admissible under Rule 404(b) because (1) the evidence was necessary to explain how Jones's photograph came to be included in David's photo line-up and (2) the evidence showed an MO similar to that during the robbery that led to the charges against Jones. After hearing arguments from the parties, the trial court ultimately denied Jones's motion in limine.

¶64.    At trial, the State called Detective White to testify regarding evidence obtained through his investigation of the later robbery. Prior to Detective White's testimony, Jones objected and reminded the trial court of its ruling on his motion in limine. The trial court then heard arguments from the parties as to whether, under Mississippi Rule of Evidence 403, the evidence's probative value substantially outweighed the danger of unfair prejudice to Jones. The trial court ultimately determined that the evidence from the later robbery was "appropriate [Rule] 404(b) evidence." The trial court explained that the evidence in the earlier and later crimes involved "[t]he same apartment complex, the same method of

28

operation, the same opportunities, plan, identity . . . . Importantly, they're so close in time: April 16, April 17, April 26; and that's extremely important."

¶65. After my review, I find no abuse of discretion by the trial court in ruling that the evidence from the later robbery constituted admissible evidence under Rule 404(b) to show an MO similar to that in the robbery that led to the charges against Jones. In the alternative, I find that any error suffered was harmless, as the State asserts that David's identification of Jones in a photo line-up is more than enough overwhelming evidence of Jones's guilt. *See Johnson*, 252 So. 3d at 53 (¶7); *Robbins v. State*, 235 So. 3d 205, 209 (¶11) (Miss. Ct. App. 2017) (finding any error in the admission of Rule 404(b) evidence to be harmless where the evidence of the defendant's guilt was overwhelming). I respectfully dissent, and I would affirm Jones's convictions.

**TINDELL, J., JOINS THIS OPINION.**