# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01320-COA

ERIC SCOTT HOLIFIELD A/K/A SCOTTY                    APPELLANT

v.

STATE OF MISSISSIPPI                                         APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/12/2023 |
| TRIAL JUDGE: | HON. ROBERT THOMAS BAILEY |
| COURT FROM WHICH APPEALED: | WAYNE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: HUNTER NOLAN AIKENS |
| | ERIC SCOTT HOLIFIELD (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | KASSIE ANN COLEMAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/02/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1.     Eric Holifield was convicted of first-degree murder in the Wayne County Circuit Court for killing his wife. Holifield now appeals, claiming four points of error. For the reasons discussed below, we find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On June 30, 2021, a Wayne County grand jury indicted Holifield for the murder of his wife, Kim. Holifield was subsequently tried and convicted of first-degree murder.[1] The

---

[1] Holifield's first trial resulted in a mistrial. Both parties filed a joint motion for that mistrial, and a new trial was scheduled for October 2023.

Wayne County Circuit Court sentenced Holifield to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) and ordered him to pay court costs. Holifield filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, which was denied.

¶3.     Holifield now appeals, raising four issues. Holifield's appointed appellate counsel argues only that Holifield was entitled to a jury instruction on heat-of-passion manslaughter. Holifield filed a supplemental pro se brief in which he raises three additional issues.[2] In his pro se brief, Holifield argues that he received ineffective assistance of appellate counsel, that there was insufficient evidence to support the conviction, and that the jury's verdict was against the weight of the evidence. Finding no reversible error, we affirm Holifield's conviction and sentence.

¶4.     On July 20, 2020, Kim's daughter Candace called the Waynesboro Police Department to report that Kim had been missing since the evening of July 18. Three days later, Kim's body was discovered near Tokio Frost Bridge Road in Wayne County. Although the state of decomposition made it difficult to immediately identify the body, dental records confirmed it was Kim. Holifield proceeded to trial in October 2023.

¶5.     During trial, it came to light that in March 2020, Kim began regularly communicating with Holifield's cousin Brian Holifield. Kim and Brian began talking every day, and as their relationship progressed, Kim went to visit Brian in Gautier several times between May and

---

[2] See M.R.A.P. 28(b).

early July 2020. Apparently, Kim did not attempt to hide her romantic relationship with Brian, as she told both her daughters—Candace and Savannah—about the affair, and would talk to them on the phone during her visits with Brian. Savannah testified that Kim would "even go as far as to send us screenshots of the hotel she was staying at or the numbers to the hotel." Savannah also testified that Holifield told her in May that he knew about the affair. Similarly, Brian testified that whenever Kim visited, she "was always on the phone with [Holifield] or her daughters." Each time Kim returned from visiting Brian in Gautier, Holifield reconciled with her.

### July 18-19, 2020

¶6.     Savannah and Candace testified that the last time they saw their mother alive was July 18, when they were at Holifield's house swimming in a recently installed pool. Savannah testified that the interactions between Holifield and Kim that day were "normal" and that the two "weren't arguing or anything." Candace also testified that the interactions between Kim and Holifield on July 18 were "pretty normal." That same evening, Brian accidentally called Kim while he was at work, and the two spoke briefly. She later texted him that she "hated" Holifield. Savannah also sent Kim a text that said, "[G]ood night, I love you," but Kim never responded. Savannah stated it was unusual for Kim not to reply, as "she told us good night every night."

¶7.     Savannah testified that she attempted to contact Kim a few times the next day, but Kim did not reply. She also called Candace and Holifield to see if either of them had been

3

in contact with Kim. Candace told her that she had not seen or heard from Kim. Holifield told her that he had not seen Kim since Saturday evening and did not know where she had gone. However, Holifield suggested that "[Kim] might have left walking." Savannah asked Holifield to review the security footage from external cameras around their property, but he told her that "the box" containing the footage was "missing" and that Kim had probably taken it with her when she left.

¶8. According to Savannah, she began to feel "really nervous" because she had not heard from Kim and because of Holifield's responses. When asked if it was unusual for Kim to leave without saying anything, Savannah testified that it was very unusual: "if [Kim] left, she always told us where she was." She testified, "My mom is not the one to just up and leave, especially not tell her kids where she is going." Savannah also stated that Kim had never "left walking" before and that her "mom is not going to walk anywhere."

¶9. Candace also asked Holifield to review the security camera footage, but Holifield told her that Kim had left, taking the "camera box; and her purse; . . . her medicine bag; and a small suitcase." Candace found this very strange and became worried because "[Kim] never left without telling me or Savannah."

¶10. On Sunday morning, July 19, Holifield went to the home of his good friend, Billy "Conal" Rives. Rives testified that Holifield came over and gave him a .22 caliber Walther pistol. According to Rives, Holifield told him, "I want you to hold on to this. Kim's left me again, and I want you to hold it for me because I might use it on her."

¶11. Rives testified that Holifield had confided in him about Kim's affair. Rives said that Holifield was upset when Kim went to Gautier to visit Brian but that "[Holifield] told me everything was all right after she come back."

¶12. Rives also testified that Holifield's demeanor seemed "off" on Sunday because "[h]e was kind of real upset acting and just kind of not hi[m]self." Holifield was also "walking slow" and had some scratches on his arms and legs, as well as a cut on his lip. Further, Rives testified that his dog jumped on Holifield but that Holifield never complained of being scratched, and Rives did not notice that his dog left any new marks on Holifield's arms.

¶13. In addition to asking Rives to hold the gun, Holifield also asked Rives to clean his carpets since Rives owned a carpet-cleaning business. Rives testified that when he told Holifield he could clean the carpets the next day, Holifield insisted they be cleaned that day. Holifield explained that he wanted the carpets cleaned that Sunday because the cut on his lip had gotten blood everywhere, and because he and Kim had been talking about getting the carpets cleaned. However, when they arrived at Holifield's, and Rives asked about the blood Holifield previously mentioned, Holifield told him he had already cleaned it up with some water. Rives also noticed that one of the security cameras on the property was missing, and he testified that when he asked Holifield about it, Holifield told him, "[Kim] must have took it with her so [I] wouldn't know who she left with."

¶14. Rives testified that while he was cleaning the carpets in the living room, Holifield asked him to "go over one spot real good." Rives stated the particular "spot" Holifield

wanted him to focus on was a soiled area "in front of the couch . . . . where Kim sat." Rives testified that this area appeared no more stained than it had on his previous visits to Holifield's house, but Holifield asked him to go over that spot "two or three times" until Rives was forced to say, "[Holifield] you know it ain't gonna come up."

**Monday, July 20, 2020**

¶15.    Kim's whereabouts were still unknown by Monday, July 20. Savannah and Candace found this alarming since Kim had agreed to watch Candace's son that day while Candace was at work. According to Savannah, Kim "wouldn't have left like that" since she knew she was going to watch her grandson that morning. Due to Kim's absence, Savannah agreed to watch her nephew at Holifield's house that morning. While there, Savannah asked Holifield if he had heard from Kim. Again, Holifield replied that he had not heard anything from her and that she had likely left. Savannah also called Brian to see if he had heard from Kim, but Brian had not spoken to Kim since their brief conversation Saturday night.

¶16.    Savannah looked around the house for evidence that Kim had truly left. She testified that Kim's glasses were still at the house, which she found odd. According to Savannah, Kim had very poor vision and would have taken her glasses with her if she truly left. Savannah also noticed that Holifield seemed "restless" and "was [acting] out of his own character." When asked to explain how Holifield's behavior was "out of character," Savannah explained that he was "wiping the TV vigorously like there was something on it. And he was just being real jittery." She testified that Holifield did not usually "[clean] like that . . . . [H]e would

6

wash dishes but not wip[e] the TV like he was."

¶17. Savannah testified that she also noticed the carpet had been cleaned since she had been there, and Holifield had some scratches on his arms and legs that were not there when they went swimming on July 18. When she asked Holifield about the scratches, he told her that Rives's dog had jumped on him. He told her he had gotten the carpet cleaned "because [Kim] had been wanting it cleaned."

¶18. Candace joined Savannah at Holifield's during her lunch break, and Savannah showed Candace some droplets on the kitchen floor that appeared to be blood. Subsequently, Candace called the police department to report Kim missing. Candace met with Officer Geoff Paton and informed him that Kim had not been seen or heard from since Saturday evening (July 18). Paton went to Holifield's house to investigate, and Holifield told Paton he had not seen Kim since 10 or 11 p.m. on Saturday night.

¶19. Paton testified that upon arriving at Holifield's, he noticed that wires were "hanging down" from a spot underneath the carport where a security camera had been removed. Paton asked Holifield about the wires, and Holifield explained that "the wiring was messed up, and he had to pull the wires back through the house." Paton also noticed that Holifield had scratches on his arms and legs, as well as a cut on his chin. When Paton asked Holifield about these scratches, Holifield stated the lacerations on his arms were from "fooling with a dog," and he said the scrapes on his legs were from "tree limbs and cutting some kudzu in the yard."

7

¶20. According to Paton, Holifield told police he was not sure where Kim had gone or why. However, Holifield maintained that Kim must have "left," telling Paton that some items were missing, such as Kim's "toothbrush, medication, and some other items[,] . . . [including] the DVR part of the camera system." Holifield explained to Paton that Kim likely took the DVR system "so that [Holifield] would not see who she left with." After this interaction, Paton called Investigator Jerome Jackson, and Jackson responded to Holifield's house. Once Jackson arrived, Holifield let the officers into his home.

¶21. Investigator Jackson testified that Holifield told officers the last time he saw Kim, she was on the couch texting. Holifield asked who she was texting, and Kim replied, "Brian." Jackson also stated that Holifield explained Brian and Kim "were having or had something of a relationship" and that he thought she might have left with Brian, as she had on previous occasions. According to Jackson, Holifield "didn't seem to be too shaken up about it when he explained it to me. He explained it in a fashion that kind of led me to believe that it was kind of common knowledge that at least the family knew about the allegations."

¶22. Jackson also said that Holifield was "very cooperative with police," and Jackson "detected no signs of nervousness" in Holifield during their encounter. Jackson testified that his look around the house did not reveal anything suspicious, but he did notice a stained area on the living room carpet, which Holifield appeared to have attempted to clean. When he asked Holifield about the carpet, Holifield explained that one of his grandchildren had spilled food there, and he had attempted to clean it up.

8

¶23.	Holifield later gave Investigator Jackson and Commander Hopkins permission to look around the house, and they collected swabs from the droplets Savannah had identified in the kitchen. Hopkins testified that Holifield was "cooperative" with the officers during their search. Holifield was also asked if the property's security cameras had recorded Kim's departure from the house, but he told investigator Hopkins that "Kim took the camera system with her, took the recorder with her. She took it because she probably didn't want me to know who she left with." He also provided them with a written statement about the last time he saw Kim. The statement read:

> "We were talking and she was laughing and talking. I told her I was going to bed. She said she was going to take a shower. I went to bed. She got out of the shower and went in the living room. I got up to get a cup of water. She was sitting on the couch. I asked her what she was doing. She said 'Talking to Brian.' I said, 'Sure you are.' I went back to bed. I told her 'Good night. I love you.' Approximate time 10:30 p.m. to 11:30 p.m."

¶24.	Commander Hopkins also testified that after questioning Holifield about some scrapes on his arms, Holifield replied, "[W]ell, my friend's dog scratched me on one of them, and I got the rest of them from brush I was burning out back."

**July 23-24, 2020**

¶25.	On Thursday evening, July 23, Lorie Ordoyne discovered Kim's body near Tokio Frost Bridge Road in Wayne County. Ordoyne was driving toward the bridge when she noticed a foul odor and vultures circling a particular area. As she kept driving, she noticed something "on the ground right inside the wood like" that looked like "a big rug or big blanket." Ordoyne approached the bundle, which was about "5 to 10 yards" inside the wood

9

line, and observed a partially decomposed body. Ordoyne called the police, who secured the scene, and forensic and crime scene investigators arrived the following morning, taking photos and collecting evidence. Rives turned in Holifield's gun to Sheriff Mike Mozingo after he learned a body had been found. Mozingo provided the gun to Commander Hopkins, and Holifield was arrested and charged with Kim's murder. A search warrant was also executed on Holifield's home.

¶26. Candace and Savannah also met with Commander Hopkins, who showed them photos "of several items that were out at the scene that the body had been wrapped in or wrapped around." According to Hopkins, once he showed them these photos, they "immediately" identified some of the items as Kim's. Specifically, Candace identified two blankets. One blanket was blue, and Candace provided law enforcement with a picture of Kim with that same blanket in the background. She also recognized a pink blanket, saying that Kim had bought two of the same pink blankets and given her one of them. Candace also testified that Hopkins asked for Kim's dental records, which she provided.

¶27. At trial, Dr. John Lewis of the State Medical Examiner's Office testified that he used the dental records Candace provided to law enforcement to identify Kim's corpse. Dr. Mark LeVaughn performed Kim's autopsy and testified that Kim's manner of death was homicide, as she had been shot in the face at close range. LeVaughn opined that Kim's cause of death was "a gunshot wound to the head," with the bullet coming to rest "on the surface of the fourth cervical vertebra" of the neck.

¶28. Testimony from firearms specialist Melissa Deberry revealed that the bullet recovered from Kim's neck during the autopsy had been shot from Holifield's gun. DNA analyst Jana Burchfield of the Mississippi Forensic Laboratory also testified that hair and blood recovered from Holifield's gun were a match for Kim's DNA.

¶29. Following the testimony of Burchfield and Deberry, the State rested. Holifield moved for a directed verdict, arguing that the State failed to meet its burden of proof. Holifield's motion was denied by the circuit court, and the defense rested without calling any witnesses.

¶30. After closing arguments, the jury returned its verdict and found Holifield guilty of first-degree murder. Holifield was sentenced to life imprisonment. Holifield then filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, which was denied. Subsequently, Holifield appealed.

## DISCUSSION

¶31. On appeal, Holifield claimed that the circuit court erred by refusing to accept the lesser-included-offense instruction on heat-of-passion manslaughter. Subsequently, Holifield filed a supplemental pro se brief in which he raised three additional issues. Thus, there are a total of four issues before this Court: (1) whether the circuit court should have given the lesser-included-offense instruction on heat-of-passion manslaughter; (2) whether Holifield received ineffective assistance of appellate counsel; (3) whether there is sufficient evidence to support Holifield's conviction of first-degree murder; and (4) whether the jury's verdict was against the overwhelming weight of the evidence. We find no error and affirm.

11

## I. Jury Instruction on Lesser-Included Offense

¶32. Holifield claims that the circuit court erred in refusing his lesser-included-offense jury instruction on heat-of-passion manslaughter. At trial, the State argued that there was no factual basis in the record to support such an instruction. The circuit court agreed, ruling that "[t]here has been nothing in the record to indicate heat of passion manslaughter, lesser included offense, other than what Mr. Holifield has been indicted with."

¶33. On appeal, Holifield argues that his agitation with Kim built up gradually in the weeks leading up to the incident, and on July 18, when Kim stated she was talking with Brian, it "prompted a dispute that was the final straw for Holifield and caused him to act out of passion." Based on these contentions, Holifield claims that he was entitled to the instruction because "a reasonable jury could not exclude beyond a reasonable doubt that Holifield was guilty of heat-of-passion manslaughter, and not first-degree murder."

¶34. "We review a trial judge's denial of a lesser-included-offense jury instruction de novo." *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013). "It is well settled that manslaughter is a lesser-included offense of murder." *Jones v. State*, 413 So. 3d 587, 595 (¶23) (Miss. Ct. App. 2025). However, "lesser-included-offense instructions should not be indiscriminately granted; instead, the jury should not be presented with a lesser-included-offense instruction unless the record provides an evidentiary basis for the instruction." *Wallace v. State*, 369 So. 3d 83, 87 (¶13) (Miss. Ct. App. 2023). "The court may refuse an instruction which is without foundation in the evidence." *Jones*, 413 So. 3d at 595 (¶23).

12

¶35. Additionally, "[t]he test for determining whether a manslaughter instruction based on a heat-of-passion theory is warranted is whether the defendant acted in the heat-of-passion and without malice." *Id.* at (¶24). "[T]he denial of a manslaughter instruction is proper where the record is clear that the decedent was killed with malice," and "[w]hen a deadly weapon is used . . . malice is implied." *Id.* at 596 (¶31). For the defendant to overcome the implication of malice, "there must be some evidence in the record from which the jury could determine that the act was not the result of malice, but a result of heat-of-passion." *Id.* Absent any evidence to the contrary, "a heat-of-passion jury instruction is unwarranted." *Id.*

¶36. Heat-of-passion has been defined as

> [*a*] *state of violent and uncontrollable rage engendered by a blow or certain other provocation given*, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable *provocation, by words or acts of one at the time*. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Anderson v. State*, 361 So. 3d 609, 614 (¶14) (Miss. 2023).

¶37. Stated differently, heat-of-passion "entails a state of mind marked by passion overthrowing reason." *Jones*, 413 So. 3d at 595 (¶25) (quotation marks omitted). This is not a subjective standard but, rather, an objective one, with the question being "whether a reasonable person would have been so provoked." *Id.* However, a heat-of-passion instruction is not warranted just because "someone has experienced an emotional response of any kind[;] . . . [i]nstead, the provocation must be some act that usurps the mind [and] destroy[s] judgment." *Id.* at (¶26).

13

¶38.   Holifield contends that there was sufficient evidence presented at trial for the jury to conclude that if he killed Kim, he did it while acting under the "heat-of-passion." He argues that the jury could have reasonably inferred that his cuts and scratches were the result of a physical fight preceding Kim's death and that "killing over sexual affairs is the quintessential . . . example of heat-of-passion manslaughter." However, there was no evidence indicating that Holifield was experiencing "an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror," on July 18 or 19. *Anderson*, 361 So. 3d at 614 (¶14). In fact, the record is full of testimony and evidence indicating the opposite.

¶39.   For example, Savannah and Candace both testified that Holifield and Kim were acting "normal" on July 18 and that the two "weren't arguing or anything." Savannah and Rives testified that Holifield already knew of the affair, undercutting any suggestion that the discovery of the affair that night spurred a "passion or anger suddenly aroused at the time by some immediate and reasonable provocation." Officer Jackson also testified that when Holifield told him about the affair, Holifield "didn't seem to be too shaken up . . . . He explained it in a fashion that kind of led [Jackson] to believe that it was kind of common knowledge."

¶40.   Holifield does not point to any evidence of provocation, merely arguing that the jury could infer a provocation based on Kim's affair and his scratches. However, jury instructions must be based on evidence and "should not be granted on mere speculation." *Wallace,* 369 So. 3d at 88 (¶15). Without evidence of provocation, Holifield was not entitled to a heat-of-

14

passion instruction here. Additionally, it is undisputed that Kim was killed by a deadly weapon. Therefore, malice is implied. *See Jones*, 413 So. 3d at 596 (¶31). With no evidence of heat-of-passion and ample evidence of malice, Holifield was not entitled to a jury instruction on heat-of-passion manslaughter. We agree with the circuit court that "there [is] nothing in record to indicate heat of passion, manslaughter." Here, a heat-of-passion manslaughter instruction would have been "without foundation in the evidence," and the request for the instruction was properly denied.

## II.     Ineffective Assistance of Appellate Counsel

¶41.    In his supplemental pro se brief, Holifield claims that he received ineffective assistance from his appellate counsel. Specifically, he argues that appellate counsel "filed a brief raising a ground that appellate [sic] never authorized[,] . . . arguing that appellant admitted to the crime in a manner not reflected in the trial records." Essentially, Holifield's pro se brief seeks to strike his appellate counsel's brief.

¶42.    "Our courts have repeatedly held that ineffective assistance of counsel claims are more appropriately brought during post-conviction proceedings." *Johnson v. State*, 391 So. 3d 217, 225 (¶26) (Miss. Ct. App. 2024) (quotation marks omitted). On direct appeal, this Court will only address ineffective assistance of counsel when "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id.* "We may also address such "claims on

15

direct appeal when the record affirmatively shows that the claims are without merit." *Gregg v. State*, 372 So. 3d 132, 137 (¶13) (Miss. Ct. App. 2023).

¶43. However, should the record on direct appeal prove insufficient to address the defendant's claimed ineffective assistance, "we will dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief." *Id.*

¶44. Our review of the record has not affirmatively revealed any "ineffectiveness of constitutional dimensions" by Holifield's counsel. Nor does Holifield stipulate that the record is adequate for this Court to make a finding on the merits. *See Johnson*, 391 So. 3d at 225 (¶26). Therefore, we decline to address this issue of direct appeal and dismiss Holifield's ineffective assistance of counsel claim without prejudice, leaving the issue for Holifield to raise in a motion for post-conviction collateral relief, if he desires to do so.

### III. Sufficiency of the Evidence

¶45. Holifield argues that the State failed to present sufficient evidence to support his conviction for first-degree murder. In making this argument, Holifield claims the State relied "heavily on circumstantial evidence" and argues that "absence of expert testimony linking [him] to the gun undermines the conviction."

¶46. "When this Court reviews the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Collins v. State*, 304 So. 3d 685, 691

(¶19) (Miss. Ct. App. 2020). In this regard, "[t]he issue is not whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* "Additionally, all inferences that may be reasonably drawn from the credible evidence of guilt are considered in the light most favorable to the State." *Billups v. State*, 270 So. 3d 917, 920 (¶6) (Miss. Ct. App. 2018).

¶47.    As Holifield was convicted of first-degree murder under Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2020), the prosecution was required to prove beyond a reasonable doubt that "(1) [Holifield] killed the victim; (2) without authority of law; (3) with deliberate design to effect [Kim's] death." *Willis v. State*, 352 So. 3d 602, 617 (¶41) (Miss. 2022). We find that there was sufficient evidence to conclude that the State met its burden of proof and to sustain Holifield's conviction for first-degree murder.

¶48.    The State was able to prove Holifield caused Kim's death through witness testimony, forensic testing, and Holifield's written statement. For example, Melissa Deberry testified that ballistic testing revealed that the bullet recovered from Kim matched Holifield's gun. Jana Burchfield also testified that the hair and blood found on Holifield's gun were a match for Kim. The blood swabs collected from the kitchen floor were also a match for Kim's DNA.

¶49.    Additionally, the State established that Holifield had possession of the gun on the date of Kim's murder since Holifield did not turn the gun over to Rives until the morning of July 19. Moreover, Candace and Savannah identified the blankets in which Kim's corpse was

wrapped. Rives also testified that Holifield repeatedly asked him to clean one specific spot of the carpet—a stain directly in front of Kim's usual seat on the couch. Both Rives and Savannah also testified that Holifield's behavior on July 19 was unusual, with Savannah describing him as acting "out of his own character."

¶50. The testimony of Savannah, Rives, and multiple law enforcement officers also indicates that Holifield gave varying and inconsistent explanations for the scratches on his arms and legs. The sudden appearance of scratches and their inconsistent origins lends support to the reasonable inference that Holifield was not injured by "brush" or a "dog," but, rather, he was injured while placing Kim in the woods.

¶51. Moreover, Holifield makes no claim that the killing was lawful, and the State provided sufficient evidence that Holifield acted with a "deliberate design" to kill Kim. "The term 'deliberate' means a full awareness of what one is doing and generally implies careful and unhurried consideration of the consequences. . . . [T]he term 'design' means to calculate, plan or contemplate." *Watts v. State*, 402 So. 3d 744, 749 (¶20) (Miss. 2025). "As a matter of law, deliberate design may be inferred through the intentional use of any instrument, which based on its manner of use, is calculated to produce death or serious bodily injury." *Id.* In the instant case, it is undisputed that Kim was shot and killed by a bullet fired from a gun Holifield owned. Kim was also shot in the face, which was likely to produce "death or serious bodily injury." *Id.* When this evidence is viewed in the light most favorable to the State, we find that rational jurors could have found beyond a reasonable doubt that all the

18

essential elements of first-degree murder were present.

### IV. Weight of the Evidence

¶52. Lastly, Holifield argues that his conviction was against the overwhelming weight of the evidence. In making this challenge, he claims the "State's case lacked expert testimony regarding the gun allegedly used in the crime."

¶53. "When reviewing a challenge to the weight of the evidence, our role as an appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Simmons v. State*, 387 So. 3d 1036, 1043 (¶24) (Miss. Ct. App. 2024). "In so doing, we bear in mind that when evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility." *Campbell v. State*, 380 So. 3d 985, 990 (¶10) (Miss. Ct. App. 2024).

¶54. We find Holifield's argument about the lack of expert testimony somewhat surprising, as Melissa DeBerry testified that the bullet recovered from Kim was matched to Holifield's gun. DeBerry was accepted as an expert in the field of firearms and tool mark examination, and Holifield did not challenge her qualifications at trial. Additionally, medical examiner Dr. John Lewis testified that the cause of Kim's death was a "gunshot wound to the face."

¶55. Furthermore, Holifield does not identify the evidence that weighs against the jury's verdict. Thus, we cannot conclude that the verdict is so contrary to the overwhelming weight of the evidence that it would be an unconscionable injustice to allow it to stand. *See*

*Simmons*, 387 So. 3d at 1043 (¶24).

## CONCLUSION

¶56.    Holifield was not entitled to receive a heat-of-passion manslaughter jury instruction, and our review of the evidence in the record has revealed no evidence that would have supported such an instruction. Additionally, we find that Holifield's ineffective assistance of counsel claims are best addressed through a motion for post-conviction collateral relief, should he choose to file such a motion. We also conclude that sufficient evidence was presented to support Holifield's conviction of first-degree murder. Further, the jury's verdict is not against the overwhelming weight of the evidence. Therefore, Holifield's conviction and sentence are affirmed.

¶57.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**